STATE of Wisconsin,
Plaintiff-Respondent,

v.

Cesar FARIAS-MENDOZA,
Defendant-Appellant.

Court of Appeals

*No. 2005AP365–CR. Submitted on briefs March 7, 2006.
—Decided June 6, 2006.*

2006 WI App 134

(Also reported in 720 N.W.2d 489.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Randall E. Paulson*, assistant state public defender, Milwaukee.

<hr>

[1] This case was originally assigned to the Hon. Richard Sankovitz, who presided over the suppression hearing and other matters until August 1, 2003, when the case was transferred to the Hon. Jean DiMotto because of judicial rotation. Judge DiMotto conducted the plea hearing and sentencing.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general and *Peggy A. Lautenschlager*, attorney general.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. KESSLER, J. Cesar Farias-Mendoza appeals from a judgment of conviction for second-degree intentional homicide with the use of a dangerous weapon, entered on his guilty plea. He also appeals from an order denying his postconviction motion for resentencing. Farias-Mendoza argues: (1) the trial court erroneously denied his suppression motion; and (2) the trial court erroneously exercised its discretion at sentencing. We conclude that the trial court erred in not granting Farias-Mendoza's motion to suppress the statements he made to police on the day he was arrested.[2] We therefore reverse the judgment and order, remanding the cause to allow Farias-Mendoza to withdraw his plea. Because we reverse, we do not consider Farias-Mendoza's sentencing issue.

## BACKGROUND

¶ 2. Farias-Mendoza's conviction was based on the stabbing death of his girlfriend, Theresa Kish. Law enforcement became aware of Kish's death when they responded to a telephone call at approximately 2:27 a.m. indicating that there was a "subject down" in the base-

---

[2] Farias-Mendoza's motion sought to suppress "*anything* obtained from the stop, arrest and subsequent interrogation of Mr. Farias-Mendoza." On appeal, the parties do not discuss evidence other than statements that might be subject to suppression. Therefore, our decision reversing the suppression order is limited to statements Farias-Mendoza made on the day of his arrest.

ment of Farias-Mendoza's apartment building. In the basement they found a woman who had been killed who they soon identified as Kish. Officers interviewed people in the apartment building about Kish. Officer Ronald Campos served as an interpreter for Farias-Mendoza, who is a Mexican citizen and speaks primarily Spanish. Ultimately, based on Farias-Mendoza's statement to Campos and Detective Edwin Johnson that Kish was his girlfriend and the detectives' observations of fresh scratches on Farias-Mendoza's hands, the detectives asked Farias-Mendoza to go to the police station to answer additional questions; Farias-Mendoza agreed.

¶ 3. At the suppression hearing, Campos, Johnson and two other detectives testified about what happened once Farias-Mendoza left the apartment building.[3] Campos said he transported Farias-Mendoza to the Police Administration Building (hereafter, "station") in the back of a patrol car. Campos called the police dispatch to report the beginning of the transport at 6:48 a.m.; they arrived at the station within six minutes. Upon arrival at the station, Campos took Farias-Mendoza to the Criminal Investigation Bureau ("CIB"). Campos had no conversation with Farias-Mendoza during the ride downtown or during the move into the CIB, which is on the fourth floor of the station, in a non-public area. Campos put Farias-Mendoza in Room 414, which has a door that locks automatically when the door is closed. Thus, when the door is closed, a person inside has to seek assistance from the outside to exit.

¶ 4. Johnson questioned Farias-Mendoza in Room 414 from about 7:00 to 7:30 a.m., using Campos as a translator. There were no breaks during the question-

---

[3] A psychologist also testified about Farias-Mendoza's limited mental capacity. Because we do not decide this case based on alleged mental inabilities, we do not discuss this testimony.

ing. Johnson asked how long Farias-Mendoza had been dating the victim, whether they had any fights, where he was born, where he was from, about the scratches, whether he had been drinking and when he last saw the victim. Johnson testified that he might have asked Farias-Mendoza whether he killed the victim. Johnson ended the interview after thirty minutes and left the room because he was hoping a Spanish-speaking detective could talk with Farias-Mendoza.

¶ 5. Both Johnson and Campos left the defendant alone in Room 414. Johnson testified that when he left Room 414, he did not tell Farias-Mendoza that he could leave, and Farias-Mendoza did not ask to do so. However, Johnson testified that if Farias-Mendoza had asked to leave, Johnson would not have allowed it because he thought Farias-Mendoza might be Kish's killer. Johnson further testified that he did not see Farias-Mendoza after leaving the room, and that he had no idea what was going on with Farias-Mendoza for the next five hours, although Johnson said he knew "later on that somebody was going to talk with him."

¶ 6. It is undisputed that the two officers left the interview room at approximately 7:30 a.m., leaving Farias-Mendoza locked inside. It appears that over the next five hours, no one visited Farias-Mendoza or allowed him to leave the room. None of the officers who testified said that they had any contact with Farias-Mendoza between 7:30 a.m. and 12:20 p.m., and did not see him leave the interview room, such as to use the bathroom.[4]

---

[4] The trial court indicated that it could not believe that the police "either those in uniforms or those in suits, are so careless that they would just let a person sit there five hours without talking to him nor do I believe that they're so incompetent that

¶ 7. At approximately noon, two additional detectives, Gregory Schuler and Alfonso Morales, became involved in the case. Just before 12:20 p.m., Schuler and Morales, who speaks Spanish fluently, entered Room 414. Morales had just started work for the day and had not previously had contact with Farias-Mendoza. Morales asked Farias-Mendoza if he would allow them to swab his mouth to get a DNA sample. Morales explained the DNA swabs to Farias-Mendoza, and informed him "he was not in custody." There was no testimony that Farias-Mendoza responded in any way or that Morales had any indication that Farias-Mendoza had heard, or understood, that he was free to leave. Morales testified that if Farias-Mendoza had refused to give the swabs and asked to leave, Morales would have had to let him go because they "had nothing to keep him." Farias-Mendoza agreed to give a DNA sample. The test took about five to ten minutes, and Schuler left with the swabs after they were taken.

¶ 8. After Schuler left, Detective Steven Caballero joined Morales to interview Farias-Mendoza. Morales testified that Farias-Mendoza then asked questions about what DNA was used for, and Morales explained that police can get DNA matches with offenders from victims' fingernail clippings because victims who struggle may have some offender DNA under their fingernails. Morales says Farias-Mendoza then volunteered that he had been in a physical altercation with

they would just let him be there." Nonetheless, the State produced no evidence that anyone entered the room where Farias-Mendoza was held, or that Farias-Mendoza left the room during those hours. Based on the lack of evidence to the contrary, the trial court's belief that someone must have entered the Room 414 is not supported by the record.

the victim, that the victim scratched his hand and that he hit her. This statement was made shortly after 12:30 p.m.

¶ 9. Once Farias-Mendoza made that statement, Morales and Caballero left the room to confer. They decided to place Farias-Mendoza under arrest for domestic violence (based on Farias-Mendoza's admission that he struck Kish). They reentered the interview room and, at 12:45 p.m., Morales advised Farias-Mendoza he was under arrest and read him his *Miranda* rights. Morales asked Farias-Mendoza to initial each page of the prisoner questionnaire, which was written in Spanish, acknowledging he understood the *Miranda* warnings and why he was being taken into custody.

¶ 10. Morales then proceeded to question Farias-Mendoza. Within minutes, Farias-Mendoza admitted that he had stabbed Kish to death. He continued to offer statements over the next five-and-a-half hours.

¶ 11. Farias-Mendoza was charged with first-degree intentional homicide with the use of a dangerous weapon, contrary to WIS. STAT. §§ 940.01(1)(a) and 939.63 (2003–04).[5] He moved to suppress "*anything* obtained from the stop, arrest and subsequent interrogation of Mr. Farias-Mendoza." His motion alleged that his illegal arrest tainted all of his statements to police that were given on the day of his arrest.

¶ 12. The trial court conducted a hearing over two days at which four officers testified.[6] At the hearing, the State indicated that it was not seeking to introduce any

[5] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[6] The testifying officers were Campos, Johnson, Schuler and Morales. Detective Caballero did not testify. In addition to

statements made at the apartment building or at the police station prior to Farias-Mendoza receiving *Miranda* warnings. Ultimately, the trial court denied the suppression motion.

¶ 13. Farias-Mendoza and the State negotiated a plea bargain pursuant to which Farias-Mendoza pled guilty to second-degree intentional homicide while armed, contrary to Wis. Stat. §§ 940.05(1)(b) and 939.63. He was sentenced to forty-two years of initial confinement and twenty years of extended supervision. He filed a motion for postconviction relief seeking resentencing, which was denied. This appeal followed.

## DISCUSSION

¶ 14. This case presents what is known as an "attenuation" issue. Farias-Mendoza contends that he was illegally seized within the meaning of the Fourth Amendment when he was held at the police station in a locked room for more than five hours without probable cause to arrest him. He argues that as a result of this Fourth Amendment violation, his post-*Miranda* statements to police should be suppressed because they were tainted by the initial constitutional violation and were not sufficiently attenuated from that violation.[7]

---

officer testimony, the trial court heard testimony from a psychologist who had examined Farias-Mendoza.

[7] In *Brown v. Illinois*, 422 U.S. 590 (1975), the Court noted that even if statements are voluntary under the Fifth Amendment, there is still a Fourth Amendment issue where a person is illegally seized. *Id.* at 601–02. Here, Farias-Mendoza does not contend that his statements were involuntary under the Fifth Amendment, so we will focus solely on the Fourth Amendment attenuation issue.

¶ 15. "The question of whether evidence is the fruit of a prior constitutional violation or whether 'the evidence was sufficiently attenuated so as to be purged of the taint' is one of constitutional fact." *State v. Anson*, 2005 WI 96, ¶ 18, 282 Wis. 2d 629, 698 N.W.2d 776 (citation omitted). Likewise, the threshold question of whether a person has been " 'seized' for Fourth Amendment purposes" is a question of constitutional fact. *See State v. Williams*, 2002 WI 94, ¶ 17, 255 Wis. 2d 1, 646 N.W.2d 834. When appellate courts review questions of constitutional fact, we adopt the trial court's findings of historical fact unless they are clearly erroneous, but " 'we independently apply those facts to the constitutional standard.' " *Anson*, 282 Wis. 2d 629, ¶ 18 (citation omitted).

## I. Whether Farias-Mendoza was illegally seized

¶ 16. Farias-Mendoza argues that he was under arrest when he was asked to go "downtown." In the alternative, he argues that even if his initial trip to the police station was voluntary, his placement in a locked interrogation room for over five hours became an illegal detention under the Fourth Amendment. The State disagrees, arguing that Farias-Mendoza's "arrival and presence at the police station did not constitute a seizure, arrest or detention for purposes of the Fourth Amendment."[8]

¶ 17. Not all interactions between police and citizens constitute seizures under the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 552 (1980).

---

[8] The State does not argue in the alternative that the State had probable cause to arrest Farias-Mendoza.

A seizure occurs only when an officer, by use of physical force or show of authority, restrains a person's liberty. *Id.* at 553. A person has been "seized" for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554.

¶ 18. It is not clear from the record whether the trial court concluded that Farias-Mendoza was illegally seized. The trial court found that Farias-Mendoza had been held in a locked interview room in the station for as long as five hours and twenty minutes. However, the trial court further found that no one displayed a weapon or threatened Farias-Mendoza. The trial court stated: "He may just have been five hours there without anyone paying attention to who he was whatsoever." The trial court then concluded:

> I don't believe that he was free to leave on his own in the sense that he could open the door and walk out without telling anybody or without having the assis-tance of somebody to open the door and to go through the rest of the security checkpoints to leave that facility.

Shortly thereafter, the trial court stated that Farias-Mendoza sitting in the room for five hours was the only factor that weighed in favor of a conclusion that Farias-Mendoza was under arrest, given that no guns were displayed, no handcuffs were used and

> [t]here was no confrontation of facts against him or any other kind of aggressive kind of tactic like that that the defendant might have misperceived as an effort by the State to restrain him. I think a reasonable person in the defendant's position . . . would have thought that the police were being impolite but not that he was under arrest.

737

Based on these final statements, it appeared that the trial court was finding that there had been no arrest.

¶ 19. However, the trial court shortly thereafter stated: "It was an illegal detention against the defendant's rights, his Fourth Amendment rights, to be held so long without talking to a police officer, but I don't believe that such an illegal detention tainted his confession in this case." This statement, and the fact the trial court then went on to conduct an attenuation analysis, suggest the trial court found there had been a Fourth Amendment violation.

¶ 20. Because the issue whether Farias-Mendoza was seized is a question of constitutional fact, we decline to resolve the question whether the trial court found there was an illegal seizure. Based on our analysis of the undisputed facts and accepting the facts found by the trial court, we conclude that Farias-Mendoza was seized when he was held for over five hours in a locked room in the station.[9]

¶ 21. It is undisputed that Farias-Mendoza was in a locked interview room and that the investigating detectives left that room at approximately 7:30 a.m. There is no evidence that anyone visited Farias-Mendoza or that he left the room.[10] Instead, the undisputed evidence is that the detectives next went to see

---

[9] Because the State does not seek to introduce pre-*Miranda* statements, we need not determine whether Farias-Mendoza was seized prior to being brought to the station. The fact that he was seized at any time prior to the giving of the *Miranda* warnings is sufficient to warrant an attenuation analysis.

[10] As noted in footnote four, the trial court stated that it could not believe that the police officers would just leave Farias-Mendoza unattended for five hours. However, there is no

Farias-Mendoza at 12:20 p.m., when they asked him to provide a DNA sample.

¶ 22. The State contends that this court should "conclude as a matter of constitutional fact that during his five-hour wait in the interrogation room, Farias-Mendoza was not illegally detained." The State argues:

> There is no evidence that Farias-Mendoza realized the door was locked. There is no evidence that he was physically uncomfortable during that time or that he wanted to leave. Farias-Mendoza was not confronted with the threatening presence of several officers or a display of weapons, no officer touched him, no officer used a threatening tone of voice or language, there was no physical force used, and no show of authority was used. For all of these reasons, a reasonable innocent person under all of these circumstances would not have felt that he was not free to leave.

¶ 23. We disagree with the State's conclusion. While a defendant is not automatically seized anytime he is taken to a police station for questioning, *see State v. Kramar*, 149 Wis. 2d 767, 782–84, 440 N.W.2d 317 (1989), the United States Supreme Court has recognized that an initially consensual encounter can be transformed into a seizure or detention under the Fourth Amendment, *Kaupp v. Texas*, 538 U.S. 626, 632 (2003). Assuming Farias-Mendoza's initial trip to the station was consensual, we nonetheless conclude that when Farias-Mendoza was left in a locked room for five hours, he was "seized" within the meaning of the Fourth Amendment. Under these circumstances, a reasonable person would not have believed that he was "free to leave." *See Mendenhall*, 446 U.S. at 554.

---

evidence to the contrary. Thus, any finding that officers must have visited Farias-Mendoza or allowed him to leave the room is clearly erroneous.

¶ 24. The State contends that Farias-Mendoza could have knocked on the door, asked to be let out and escorted from the building. Not only do we doubt that a reasonable person would think to do that after having been transported to the police station, questioned for thirty minutes about a homicide, and left in a locked room, we question the State's suggestion that it was Farias-Mendoza's duty to try to get out of the locked room. The State cites no authority for such a proposition, and we are unconvinced that Farias-Mendoza was required to seek to leave. A reasonable person who is locked in an interview room for five hours would not believe that he was free to leave. Accordingly, we conclude that Farias-Mendoza was illegally seized.

## II. Whether the seizure was "sufficiently attenuated" from the post- *Miranda* statements

█

¶ 25. We have concluded that Farias-Mendoza's constitutional rights under the Fourth Amendment were violated when he was illegally seized. He argues that because of this illegality, the post-*Miranda* statements are inadmissible because they were "tainted" by the illegal seizure. However, under the attenuation doctrine, "a court need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police." *State v. Tobias*, 196 Wis. 2d 537, 544, 538 N.W.2d 843 (Ct. App. 1995).

¶ 26. Under the attenuation doctrine, the determinative issue is "whether, granting establishment of the primary illegality," the evidence was derived from the "exploitation of that illegality or instead by means

sufficiently distinguishable to be purged of the primary taint." *State v. Simmons*, 220 Wis. 2d 775, 780, 585 N.W.2d 165 (Ct. App. 1998) (internal quotation marks and citations omitted). In considering whether the causal chain is sufficiently attenuated, the court may consider: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of "intervening circumstances"; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). The burden of showing admissibility of any statements rests on the prosecution. *Id.* at 604.

¶ 27. The State, citing *Brown*, acknowledges that the giving of *Miranda* warnings alone "does not per se cause the statement to be sufficiently attenuated to be purged of the taint of the prior illegality." However, the State argues that analysis of the three *Brown* factors in this case suggests there was sufficient attenuation.

## A. Temporal relationship

¶ 28. We are required to consider the amount of time that elapsed between the illegality and the acquisition of the challenged evidence. *See Brown*, 422 U.S. at 603–04. In doing so, we must also consider the conditions during the lapse of time. *See State v. Phillips*, 218 Wis. 2d 180, 206, 577 N.W.2d 794 (1998). "In the strictest of custodial conditions, the passing of only a short time might not be long enough to purge the initial taint." *Id.* at 207. For example, in *State v. Kiekhefer*, 212 Wis. 2d 460, 569 N.W.2d 316 (Ct. App. 1997), this court concluded that the Constitution required suppression of evidence obtained during a search that resulted from the exploitation of illegal entry to a room in a home. We held that where the

police obtained unwarned statements and physical evidence within fifteen minutes of entering the room, "passage of time [was] not an attenuating factor." *Id.* at 482.

¶ 29. Here the temporal proximity of the confession to the illegal detention was likewise very close. Within twenty-five minutes of the end of Farias-Mendoza's isolation, he confessed to the homicide. While being illegally detained, after giving a DNA sample at 12:20 p.m., Farias-Mendoza made the first incriminating statement about hitting the victim. That statement prompted his arrest at 12:30 p.m. for domestic violence, and the reading of *Miranda* warnings in Spanish. By 12:45 p.m. Farias-Mendoza had confessed to the murder. Although, as the State notes, there is no evidence that Farias-Mendoza was threatened or intimidated, the fact remains that after giving a DNA sample and admitting to a fight with Kish, there were only a few minutes for him to consider his situation. The fifteen-minute separation between the arrest (presumably the end of the illegal detention) and the confession suggests the taint of the illegal detention had not been removed by the passage of time, especially where the five-hour incommunicado detention may well have had an "inherently coercive" effect. *See New York v. Quarles,* 467 U.S. 649, 654 (1984) (interrogation process is "inherently coercive").

## B. Intervening circumstances

¶ 30. The second factor to consider is whether there were "intervening circumstances" between the illegality and the confession. *See Brown,* 422 U.S. at 603. The State argues:

> The DNA swab and conversation about DNA constituted an intervening factor because the conversation

triggered Farias-Mendoza's admission that he had a physical fight with Kish. Farias-Mendoza's conversation with Detective Morales about what DNA can show weighs in favor of attenuation. The conversation demonstrates that it was the information that his DNA might be found under the victim's fingernails, rather than the length of his prior wait in the interrogation room, that caused Farias-Mendoza to exercise his free will and make a statement admitting he committed the crime.

¶ 31. We disagree with the State's reasoning. Rather than suggesting the illegality was attenuated, the fact that officers entered Farias-Mendoza's room after five hours and immediately asked him to offer a DNA sample exacerbated the detention. Farias-Mendoza spoke to no one for five hours, and suddenly was asked to voluntarily provide a DNA sample and then questioned about his last moments with Kish. It is more accurate to suggest that these actions *exploited* the five-hour isolation, rather than *dispelled* the taint of the illegal seizure. It was police action—specifically conversation they initiated with Farias-Mendoza—that prompted the statements that led to his official arrest and subsequent questioning.

## C. Purpose of the misconduct

¶ 32. The third factor to consider is "the purpose and flagrancy of the official misconduct." *See Id.* at 603–04. "[I]nherent in the flagrancy or purposefulness evaluation is an inquiry into whether there is evidence of some degree of bad faith exploitation of the situation on the part of the officer." *State v. Richter*, 2000 WI 58, ¶ 53, 235 Wis. 2d 524, 612 N.W.2d 29. The trial court found that the officers did not "purposefully" hold

Farias-Mendoza for five hours. We question this finding, given that Farias-Mendoza was left in a locked interview room. Although the police did not have sufficient evidence to arrest him, Detective Johnson testified that he would not have let Farias-Mendoza leave if Farias-Mendoza had asked to because of Johnson's suspicion that Farias-Mendoza was possibly the killer. Any inference that Farias-Mendoza was simply forgotten, or accidentally abandoned, is inconsistent with later police conduct.

¶ 33. Although both Johnson and Morales conceded that they did not have sufficient evidence for an arrest, neither told Farias-Mendoza he was free to go or, apparently, paid attention to the fact that Farias-Mendoza was left alone for five hours. Morales testified that he did tell Farias-Mendoza that he was "not in custody," but no evidence shows that Farias-Mendoza understood that statement to mean he was free to leave. Regardless of whether the officers involved intended to isolate Farias-Mendoza in a locked interrogation room for five hours, their inaction led to exactly that result.

¶ 34. Assuming that Farias-Mendoza was not intentionally held for five hours, that would present the strongest argument for attenuation. However, this factor alone does not overcome the temporal proximity and exacerbating circumstances clearly established to create the factual attenuation needed to dispel the taint of the illegal seizure.

## CONCLUSION

¶ 35. We conclude that Farias-Mendoza was illegally seized in violation of the Fourth Amendment. We further conclude that Farias-Mendoza's post-*Miranda* confession, which was offered within twenty-five min-

744

utes of the officers' first questions to Farias-Mendoza after his five hours of isolation, was insufficiently attenuated from the illegal seizure. Therefore, Farias-Mendoza's post-*Miranda* statements should have been suppressed. We reverse the judgment and order, remanding the cause to allow Farias-Mendoza to withdraw his plea.

*By the Court.*—Judgment and order reversed and cause remanded.