PER CURIAM.
¶1 Zachary Marek appeals a judgment entered following his guilty plea, convicting him of second-degree sexual assault, and an order denying his postconviction motion. Marek contends the results of a DNA test should have been suppressed because he was illegally arrested without probable cause, and his illegal arrest tainted his subsequent consent to submit a DNA sample. We conclude that, even assuming Marek was arrested without probable cause, his consent to submit a DNA sample was sufficiently attenuated from the arrest so as to purge the taint of any illegality. We therefore affirm.
BACKGROUND
¶2 An Information charged Marek with two counts of first-degree sexual assault and two counts of felony intimidation of a victim. The sexual assault charges arose out of allegations that in the early morning hours of June 26, 2013, Karen[1] received a phone call from a man asking her to pick him up at Freedom Park in Prescott. Karen believed that the caller was her friend, Nick. She drove to the park, where a man snuck up behind her, put his hand over her mouth, and held a knife to her throat. He proceeded to insert his fingers into her vagina and attempted to insert his penis into her vagina. After the assault, the attacker fled the park on foot. Although Karen was unable to positively identify her attacker, she knew that he was a young, white male and not her friend Nick, who was a black male.
¶3 The lead detective investigating the case, Robert Funk, began to focus on Marek as a possible suspect. Funk knew from prior interactions with Marek that he was a young, white male who had attended the same high school as Karen, that he lived in close proximity to Freedom Park, and that he had previously been suspected of wielding a knife in an altercation. Funk therefore directed Prescott police officer Steve Robinson to go to the apartment of Marek's father, Nathan, in order to make contact with Marek.
¶4 Nathan allowed Robinson into the apartment, where he found Marek lying in bed. Funk then arrived at the apartment, where he arranged for Karen to observe Marek from his squad car while Marek was outside the apartment. While in the squad car, Karen indicated that she recognized Marek from school, but she could not be sure if he was her attacker. Funk then talked with Marek on his squad car speaker phone, with Karen listening. Karen told Funk that she was seventy to eighty percent sure that Marek's voice matched her attacker's. At that point, Funk did not believe that he had probable cause to arrest Marek, although he still considered him a suspect. Funk asked Nathan if he would bring Marek to the police station later that morning for a voluntary interview, and Nathan and Marek agreed to do so. Funk then left the house, after asking Nathan not to allow Marek to shower before coming to the station.
¶5 Prior to the scheduled interview, Nathan called Robinson and asked if he could pick up Marek and bring him to the police station because Marek wanted to take a shower and was being disorderly. Robinson then went to the apartment, picked up Marek, and brought him to the police station in his squad car. Robinson did not tell Marek he was under arrest at that time, nor did he threaten, handcuff, or restrain him in any way.
¶6 At the police station, Robinson brought Marek to an interview room, where he waited with Marek until Funk was ready to interview him. Once Funk arrived, he read Marek his Miranda[2] rights. Marek waived those rights and agreed to speak with Funk. Funk proceeded to explain to Marek that he was at the police station because he was a suspect in a sexual assault investigation. Approximately twenty-five minutes into the interview, Funk asked Marek if he would consent to submit a DNA sample. Marek immediately gave his verbal consent.
¶7 After initially giving his consent, Marek asked Funk to clarify what a DNA sample was. Funk explained that a swab would be used to take a sample from inside of Marek's cheek, and that the sample would be compared to any evidence found in the case. Marek indicated he understood, and again consented to give a DNA sample. Funk continued his explanation, telling Marek that DNA was not only in blood and semen, but could be found in skin, hair, or mucous. Marek said that he understood. Funk shifted the interview to other topics for about thirty minutes before returning to the subject of a DNA sample, this time telling Marek that if he was not involved in the sexual assault, the best way to eliminate him as a suspect would be by comparing his DNA to the DNA found on the victim. Marek again indicated he understood and that he was willing to submit a DNA sample. Funk then concluded the interview.
¶8 Marek remained in the interview room for an additional two-and-one-half hours, awaiting the arrival of a nurse to collect the DNA sample. Once the nurse arrived, she read a consent form to Marek, which he signed, and she collected his DNA sample. The DNA test results linked Marek to Karen's assault, and the State charged Marek with the crimes referenced above.
¶9 Prior to trial, Marek moved to suppress the DNA test results on the grounds that they were the product of an illegal arrest. The circuit court orally denied the motion, concluding that Marek went to the police station voluntarily and he was never placed under arrest.
¶10 Marek ultimately pled guilty to an amended charge of second-degree sexual assault with use or threat of force or violence. The circuit court imposed a sentence consisting of twenty years' initial confinement and eight years' extended supervision.
¶11 Marek's postconviction counsel initially filed a no-merit report with this court, but after we questioned whether any issue would have arguable merit, counsel requested to file a postconviction motion. We therefore dismissed the appeal.
¶12 Marek subsequently filed a postconviction motion, making the same arguments for suppression of the results of the DNA test as he made in his pretrial motion. The circuit court denied Marek's motion for postconviction relief, again determining that Marek was not arrested prior to consenting to submit a DNA sample. Further, the court determined that even if Marek had been arrested, the arrest was lawful because law enforcement had reasonable grounds to believe that Marek had committed a crime. Marek now appeals.[3]
DISCUSSION
¶13 We review a circuit court's denial of a motion to suppress utilizing a two-step inquiry. State v. Parisi , 2016 WI 10, ¶26, 367 Wis. 2d 1, 875 N.W.2d 619. First, we accept the circuit court's findings of facts unless they are clearly erroneous. Id. Second, we independently apply constitutional principles to those facts. Id.
¶14 On appeal, Marek contends that the results of the DNA test should have been suppressed because he was arrested without probable cause, and that his illegal arrest tainted his subsequent consent to submit a DNA sample. The State concedes that Robinson arrested Marek when he brought him to the police station, but it argues that the circuit court correctly concluded that the arrest was supported by probable cause. Alternatively, the State argues that even if probable cause did not support Marek's arrest, his consent to submit a DNA sample was sufficiently attenuated from the arrest to purge the taint of any illegality.
¶15 Assuming without deciding that Marek was arrested and that the arrest occurred without probable cause, we conclude that his consent to submit a DNA sample was sufficiently attenuated from the arrest to purge any taint from its illegality. Therefore, the circuit court properly denied Marek's suppression motion.[4]
¶16 The collection of a suspect's DNA sample by police constitutes a search and is subject to the reasonable search and seizure requirements of both the Fourth Amendment and the Wisconsin Constitution. Parisi , 367 Wis. 2d 1, ¶28. A warrantless search is per se unreasonable unless it falls within a well-recognized exception to the warrant requirement. Id. One such exception is a search conducted pursuant to consent. State v. Artic , 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430. Marek does not dispute that he did, in fact, consent to submit a DNA sample. Therefore, we review only whether his consent was constitutionally valid.
¶17 When consent to a search is obtained following an illegal arrest, the State must show that the consent was sufficiently attenuated from the arrest for the consent to be constitutionally valid. State v. Hogan , 2015 WI 76, ¶¶57-58, 364 Wis. 2d 167, 868 N.W.2d 124. We analyze three factors to determine whether the consent is sufficiently attenuated from the illegal arrest: "(1) the temporal proximity of the official misconduct and seizure of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." State v. Phillips , 218 Wis. 2d 180, 205, 577 N.W.2d 794 (1998).
¶18 In its written decision and order denying Marek's postconviction motion, the circuit court found the following facts that we consider relevant to our analysis. Nathan called Robinson and told him that he wanted Marek out of his apartment because Marek was out of control and being disorderly.[5] Robinson then went to the apartment and told Marek that he needed to come to the police station with him, and Marek complied. Robinson did not handcuff or restrain Marek. Although Nathan testified at the postconviction motion hearing that Robinson threatened to tase Marek if he did not come to the police station, the court explicitly found that testimony not to be credible and found "as a fact, that Officer Robinson did not threaten to tase Zachary Marek." In the interview room, Marek was not handcuffed or restrained in any manner, and police did not make any threats or promises to Marek. During the interview, Marek did not appear nervous or fearful, and he was "totally cooperative at all times." Funk read Marek his Miranda rights prior to interviewing him, and Marek waived those rights because he wanted to speak with law enforcement. Funk and Marek then proceeded to have "a conversation."[6] With the exception noted herein, Marek does not argue that these findings are clearly erroneous.
1. Temporal proximity
¶19 Under the first factor of sufficient attenuation-temporal proximity-we examine both the amount of time between the illegal arrest and the consensual search, as well as the conditions that existed during that period of time. Phillips , 218 Wis. 2d at 206. A long lapse of time between an illegal arrest and a consensual search weighs in favor of finding attenuation. Id. Even a short lapse of time can support attenuation if "congenial conditions" exist that mitigate the effect of the unlawful activity. Artic , 327 Wis. 2d 392, ¶77. For instance, in even the "strictest of custodial conditions," the congenial nature of an illegal arrest was held to purge evidence of the taint of an illegal arrest after only forty-five minutes. State v. Anderson , 165 Wis. 2d 441, 449, 477 N.W.2d 277 (1991) (citing Rawlings v. Kentucky , 448 U.S. 98, 107-08 (1980) ).
¶20 Here, the State argues that the long length of time between Marek's arrest and Marek's DNA submission, along with the congenial nature of Marek's interview, supports a determination of sufficient attenuation. We agree.
¶21 Although the circuit court did not make an explicit finding regarding the amount of time between Marek's arrest and collection of the DNA sample, Marek concedes that he submitted his DNA sample approximately three-and-one-half hours after the interview began. In addition, the facts found by the circuit court show that the conditions surrounding the interview were congenial. Marek was not restrained or handcuffed. He was not nervous or fearful, and he cooperated with police the entire time. When Marek had a question about the DNA sample, Funk explained what a DNA sample was and that Marek's sample would be compared to evidence found during the investigation.
¶22 Marek argues that there "wasn't enough time to pass for the consent to be untainted by the illegal seizure" because Marek's initial "consent to the DNA sample was given in close proximity to the Miranda warnings." The sole legal authority Marek cites in support of this argument is his conclusory statement that this case is "like [ State v. ]Farias-Mendoza ," 2006 WI App 134, 294 Wis. 2d 726, 720 N.W.2d 489. We reject Marek's underdeveloped argument. In Farias-Mendoza , which we discuss in detail below, the defendant consented to give a DNA sample before he was read Miranda warnings. See Farias-Mendoza , 294 Wis. 2d 726, ¶¶7-9. Here, Marek's initial consent came approximately thirty minutes after he was given Miranda warnings, and he reaffirmed his consent twice before his DNA sample was actually taken three hours later. We conclude the long lapse of time between the arrest and the consensual search weighs in favor of finding attenuation.
2. Intervening circumstances
¶23 Under the second factor of sufficient attenuation-the presence of intervening circumstances-we analyze whether Marek's decision to consent to submitting a DNA sample was a product of his own free will, unaffected by the initial illegal arrest. See Artic , 327 Wis. 2d 392, ¶79. The reading of Miranda warnings and an individual's waiver of his constitutional rights is one intervening circumstance that weighs in favor of finding attenuation. Anderson , 165 Wis. 2d at 450. So too is the disclosure by investigators to a person that he or she is the suspect in an investigation. State v. Kiekhefer , 212 Wis. 2d 460, 482, 569 N.W.2d 316 (Ct. App. 1997). Finally, forthright discussions between a suspect and an investigating officer about the purpose of a search may constitute an intervening circumstance. Phillips , 218 Wis. 2d at 209.
¶24 Here, the State argues that all of these intervening circumstances were present and support a determination of sufficient attenuation. Again, we agree. As noted above, Funk did not question Marek at the police station until he read Marek his Miranda rights and Marek waived them. Funk then forthrightly told Marek that he was the suspect in a sexual assault investigation and that the police were going to collect DNA evidence from the victim. Marek then gave his consent to submit a DNA sample and agreed with Funk that if he were not the perpetrator, he would not have to worry about his DNA being found on the victim. Thirty minutes later, Funk again told Marek that he wanted to obtain a DNA sample so that he could eliminate Marek as a suspect, and Marek again consented to submit a sample. Marek reiterated his consent two-and-one-half hours later, when the examining nurse read him a consent form, which he signed. In addition, the record does not disclose any negative intervening circumstances that might weigh in favor of suppression.
¶25 Marek again relies on Farias-Mendoza to argue that there were no intervening circumstances present. Due to the factual differences between Farias-Mendoza and this case, we are not persuaded.
¶26 In Farias-Mendoza , police illegally detained and isolated the defendant for five hours, and then asked him to submit a DNA sample. Farias-Mendoza , 294 Wis. 2d 726, ¶7. After he submitted a DNA sample, police read him Miranda warnings, and soon thereafter he gave a confession. Id. , ¶9. The court determined that there was not sufficient attenuation between the arrest and the confession, as the police acted to exploit an illegal detention, rather than to dispel the taint of the illegal seizure. Id. , ¶31. Here, the police did not exploit Marek's detention. No evidence was collected from Marek until after he had been read his Miranda warnings, and he was repeatedly asked whether he wanted to submit a DNA sample. The circuit court found that Marek's behavior indicated he agreed to do so because he mistakenly believed that the DNA test results "would not link him to the crime," not because he felt compelled to do so. This finding is not clearly erroneous.
¶27 We conclude that meaningful intervening circumstances show Marek's decision to submit a DNA sample was a product of his own free will, and that this factor strongly weighs in favor of a determination of sufficient attenuation.
3. Police conduct
¶28 Under the third factor of sufficient attenuation-purposefulness and flagrancy of the police conduct-we analyze whether there is evidence that law enforcement acted with some degree of bad faith in exploiting a violation of the law. Artic , 327 Wis. 2d 392, ¶91. Police use of violence, threats, deception, or trickery weighs against finding attenuation. Phillips , 218 Wis. 2d at 211.
¶29 Here, there was no flagrant police misconduct. The circuit court found that police did not assault, threaten, restrain, or handcuff Marek, nor did they make him any false promises. These findings are not clearly erroneous.
¶30 Marek insists there was flagrant police misconduct because Robinson "took Marek, against his will [from the apartment], because he wanted to shower," and because officers did not inform Marek that he was free to leave the station or change his mind about submitting a DNA sample. We are not persuaded. As discussed above, the circuit court found Robinson went to Nathan's apartment to pick up Marek because Nathan called and asked him to remove his disorderly son, not simply because Marek wanted to take a shower. This finding is not clearly erroneous. Further, Funk's repeated inquiries about whether Marek would consent to give a DNA sample gave Marek a chance to change his mind. And although Funk did not explicitly tell Marek he was free to leave, Marek cites no authority to support his assertion that this constitutes police misconduct. We will not consider undeveloped arguments. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). We conclude this factor supports a determination of sufficient attenuation.
¶31 In sum, analysis of all three sufficient attenuation factors support our determination that Marek's consent to submitting a DNA sample was not tainted by his arrest. The temporal proximity between the alleged arrest and the taking of the DNA sample was long, there were meaningful positive intervening circumstances, and there was no flagrant misconduct by police.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Pursuant to Wis. Stat. Rule 809.86(4) (2015-16), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Miranda v. Arizona , 384 U.S. 436 (1966).

Marek also raised a claim of ineffective assistance of trial counsel in his postconviction motion, but he does not pursue this claim on appeal. Issues raised in the circuit court, but not raised on appeal, are deemed abandoned. Smith Corp. v. Allstate Ins. Cos. , 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

We therefore exercise our right to affirm the circuit court's decision on grounds other than those relied on by the circuit court. See State v. Trecroci, 2001 WI App 126, ¶45, 246 Wis. 2d 261, 630 N.W.2d 555.

In his reply brief, Marek, citing Robinson's testimony that he went to Nathan's apartment because Nathan called Robinson and told him Marek "wanted to take a shower," argues that this finding is clearly erroneous. However, Marek ignores that Robinson also testified that Nathan told him Marek was "out of control, being disorderly, and [Nathan] wanted [Marek] out of the apartment." We therefore reject Marek's argument that the court's finding is clearly erroneous.

Although the circuit court did not make explicit findings on the contents of this conversation, the interview was video recorded and entered into evidence. As the parties have not raised any factual disputes about the substance of the conversation, we accept their representations regarding the conversation as undisputed facts.