# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP1267CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |   v. |
| | Andy J. Parisi, |
| |        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 360 Wis. 2d 491, 864 N.W.2d 121)
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | February 24, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 5, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Winnebago |
|   JUDGE: | Daniel J. Bissett |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | A.W. BRADLEY, ABRAHAMSON, J.J., dissent. |
| | (Opinion Filed) |
|   NOT PARTICIPATING: | |

ATTORNEYS:

    For the defendant-appellant-petitioner, there were briefs by *Tristan S. Breedlove*, assistant state public defender, and oral argument by *Tristan S. Breedlove*.


    For the plaintiff-respondent, the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

**2016 WI 10**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP1267-CR
(L.C. No. 2013CF242)

STATE OF WISCONSIN          :          IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent,

    v.

Andy J. Parisi,

    Defendant-Appellant-Petitioner.

**FILED**

**FEB 24, 2016**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J.   This is a review of an unpublished decision of the court of appeals, State v. Parisi, No. 2014AP1267-CR, unpublished slip op. (Wis. Ct. App. Jan. 21, 2015) (per curiam), which affirmed the Winnebago County circuit court's[1] judgment of conviction and denial of defendant Andy J. Parisi's ("Parisi") motion to suppress evidence of heroin possession.

¶2 The circuit court below upheld a warrantless draw of Parisi's blood as justified under the exigent circumstances

---

[1] The Honorable Daniel J. Bissett presided.

exception to the warrant requirement of the Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitution. The court of appeals below affirmed on different grounds. Relying on our decisions in State v. Foster, 2014 WI 131, 360 Wis. 2d 12, 856 N.W.2d 847, and State v. Kennedy, 2014 WI 132, 359 Wis. 2d 454, 856 N.W.2d 834, the court of appeals determined that the good faith exception to the exclusionary rule applied to prevent suppression of the drug-related evidence in this case.

¶3 We conclude that the blood draw in this case was constitutional because it was supported by exigent circumstances. We therefore need not address whether the good faith exception to the exclusionary rule also applies in this case. See State v. Tullberg, 2014 WI 134, ¶¶4-5, 359 Wis. 2d 421, 857 N.W.2d 120 (declining to address State's argument that the good faith exception to the exclusionary rule justified warrantless blood draw where blood draw had been found constitutional under exigent circumstances doctrine).

I. FACTUAL BACKGROUND

¶4 On October 16, 2012, at 12:38 a.m., several officers were dispatched to an address in Winnebago County, Wisconsin, to respond to a report of a male subject who was possibly not breathing.[2] One of the officers who responded to the call was Officer Kaosinu Moua ("Officer Moua") of the Oshkosh Police

---

[2] The facts in this section are taken from testimony provided at the July 12, 2013 suppression hearing.

Department, who arrived at the residence "within five to ten minutes or so" after dispatch along with "a couple other officers."

¶5    Officer Moua testified that when he arrived at the residence, "one of the roommates[,] I believe one of the girls was outside waving us--trying to get us directed to the proper residence."    Officer Moua entered the residence.    During the medical call, police officers, members of the Oshkosh Fire Department, and the four roommates who lived at the residence in question were at the residence.

¶6    Inside, a male individual was lying in the living room on the floor on his side.    There was vomit on the floor and on the sofa.    The individual was not immediately identified by Officer Moua because the individual "wasn't able to talk to" Moua or the other officers.    Eventually, the individual was identified as Parisi.

¶7    Members of the fire department were "checking for [Parisi's] vitals and making sure he was breathing."    Officer Benjamin Fenhouse ("Officer Fenhouse"), who arrived at the residence at an unspecified time, was told that Narcan had been administered to Parisi.    Officer Fenhouse testified that he had seen Narcan administered "between five and ten times" in the course of his employment, and that Narcan is "usually administered for people who have overdosed on heroin[,] and it reverses the effects and usually brings them back to a

responsive state pretty rapidly."[3]  According to Officer Fenhouse, the Narcan "work[ed]" when administered to Parisi.

¶8  Officer Moua spoke with two of the roommates, who said that they did not know why Parisi was ill because they had been asleep.  The roommates explained that Parisi had come over between 9:00 p.m. and 9:30 p.m. to watch "the game."  "After the game," Parisi told his friends "that he wanted to go to the gas station, get something to eat and drink, so he did walk to the gas station and walked back," alone.  After midnight, and after the roommates had gone to sleep, one of the roommates went to get a drink of water and "could hear some[body] breathing hard or [somebody] having problems breathing."  The roommate entered the living room and saw Parisi.

¶9  There were a total of five to seven officers "working on [the] case" that evening.[4]  Because at least one of the

---

[3] Narcan is the trade or brand name of the narcotic antagonist naxolone.  2 Robert K. Ausman and Dean E. Snyder, Ausman & Snyder's Medical Library: Lawyers Edition § 3:45 (1988).  "Naxolone is a narcotic antagonist indicated for the complete or partial reversal of narcotic depression, including respiratory depression, induced by narcotics such as . . . heroin . . . .  Naxolone is also indicated for the diagnosis of suspected acute narcotic overdosage."  Id.

[4] Counsel for Parisi asked Officer Moua on cross-examination whether each of six specific officers had been present at the residence.  Officer Moua confirmed that five out of the six named officers were present, but could not remember whether the sixth named officer had also been present.  Officer Moua then volunteered that there had also been a sergeant present at the residence, bringing the potential number of officers at the residence to seven.  Yet when counsel for Parisi then asked Officer Moua, in summary, if a total of "possibly five to six officers were involved" in the case, Officer Moua responded,
(continued)

4

officers had had "prior contact involving drugs with" Parisi, there was "suspicion" that drug use had been the cause of Parisi's condition.

¶10  A search of the upstairs was performed.  The officers located, in a room separate from the room in which Parisi was found, "a bindle of what looked to be heroin wrapped in tinfoil, some cut ends, and [a] marijuana pipe."  Officer Moua testified that Parisi did not live at the residence, but that Officer Moua had been told by the roommates that "everybody had access to [the] room [where the drug-related items were found]."

¶11  Officer Moua testified that the officers were at the apartment investigating "probably about an hour."[5]  At some point during the investigation, Parisi was taken to the hospital by ambulance.  Some officers continued their investigation at the residence after Parisi's departure.  Officer Fenhouse followed the ambulance to the hospital in order to "investigate a heroin overdose and obtain . . . an evidentiary test of [Parisi's]

_____

"Sure."  Officer Fenhouse similarly testified that there had been between five and six officers involved in the medical call.

[5] On direct examination Officer Moua testified that the officers were at the apartment "probably within the hour."  On cross-examination counsel for Parisi asked:

Q:  And when the State asked you how long you-- the officers were on scene, you said within an hour?

A:  I said probably about an hour, sure.

Q:  So maybe slightly less than an hour?

A:  I couldn't even remember.

blood." Officer Fenhouse estimated that he was at the residence "like 20 minutes to a half hour" before leaving with the ambulance. Officer Moua also followed the ambulance.

¶12 At the hospital, according to Officer Fenhouse, "Parisi's medical condition was[,] I guess for lack of a better term[,] up in the air. [Hospital staff] were tending to him and then it seemed things were getting better and then it would deteriorate again." At some point in time, Officer Fenhouse asked for Parisi's consent to take a blood sample, but "did not get [it]." Officer Fenhouse asked a phlebotomist to draw a sample of Parisi's blood without Parisi's consent in order "[t]o analyze it for evidence of a crime . . . [specifically, for] evidence of heroin." When asked on direct examination whether "there [was] something beyond administration of Narcan that suggested" to Officer Fenhouse that Parisi might have used heroin, Officer Fenhouse responded:

> I was on the scene for a period of time and then I went to [the hospital]. I was in contact with persons that were still on scene, mainly officers, who provided me information that there was evidence of drug use and that led the investigation in a way that it could be heroin overdose.

¶13 Officer Fenhouse filled out a form specifying, among other things, the time that Parisi's blood was drawn. The form originally read that Parisi's blood was taken at "1:55 a.m.," but that time was crossed out and the time "3:10" was written in its place. Next to "3:10" were initials belonging, apparently, to Officer Fenhouse and the phlebotomist. Officer Fenhouse

6

testified that according to his report, the time on the form was changed because

> [Parisi's] health deteriorated or there was something else happening inside the room where it didn't kind of go as planned. That was filled out and we were intending on drawing [Parisi's blood] at a certain time, however, based on the medical needs of Mr. Parisi, it was obtained at a later time.

¶14 Officer Fenhouse testified that in his experience——which consisted of the acquisition of "about 12" search warrants——it takes approximately two hours to obtain a search warrant. Officer Fenhouse did not attempt to obtain a search warrant prior to the blood draw. Later testing of Parisi's blood at the State Crime Lab "indicated the presence of opiates and morphine (a metabolite of heroin)."[6]

## II. PROCEDURAL BACKGROUND

¶15 On March 25, 2013, the State filed a criminal complaint against Parisi, charging him with possession of narcotic drugs (heroin), second and subsequent offense, contrary to Wis. Stat. §§ 961.41(3g)(am), 939.50(3)(i), and 961.48(1)(b) (2013-14).[7] On June 14, 2013, Parisi filed a motion to suppress the evidence of drug possession taken from the draw of Parisi's blood as unconstitutionally obtained without a warrant and without consent.

---

[6] This last fact was taken from the affidavit in support of the criminal complaint against Parisi.

[7] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

¶16 On July 12, 2013, a hearing on Parisi's suppression motion was held in Winnebago County circuit court.  The State argued that exigent circumstances justified the blood draw at issue because the rapid rate of heroin dissipation in the human body rendered obtaining a warrant infeasible.  The State based its assertions in part on a scientific article that summarized various studies on the metabolism of heroin in the human body.  See Elisabeth J. Rook et al., Pharmacokinetics and Pharmacokinetic Variability of Heroin and its Metabolites: Review of the Literature, 1 Current Clinical Pharmacology 109 (2006) ("Rook article").  The article was admitted without objection from the defense.[8]

¶17 The article defines heroin as "a semi-synthetic morphine derivative."  Id. at 109.  Before the circuit court, the State cited the article to explain that heroin breaks down in human blood into 6-monoacetylmorphine, which breaks down further into morphine.  The State offered the relevant timeframes for the metabolism of heroin, as set forth in the Rook article: "When heroin is used, the heroin that's actually in the blood lasts just basically a few minutes, and I don't recall the exact numbers . . . but it's in the neighborhood of

---

[8] The defense informed the circuit court, "I guess I would have no objection to the [c]ourt considering the scientific article because I certainly think there's been some peer review of that."

8

five minutes.[9] . . . 6-monoacteylmorphine was detected in plasma for one to three hours." The State did not dispute that morphine was detectable in the blood for some time thereafter, but argued that unlike 6-monoacetylmorphine, morphine "can be created by a number of different substances. It could indicate somebody used heroin and it's been a number of hours or it could indicate something like they used morphine and there are other prescription drugs that break down into morphine as well."

¶18 Thus, "while the presence of morphine in someone's blood is relevant to whether they possessed heroin, it's certainly not conclusive evidence." The thrust of the State's argument, then, was that

> if it's going to be more than that one to three-hour range that means that the State would be losing what could be necessary evidence in proving possession of heroin. And in this case . . . we don't know the exact time of use . . . . And it was approximately two and a half hours after the dispatch when the blood draw actually occurred.

The State concluded by arguing for a per se rule, maintaining that "in basically any case where we have heroin use, it's creating an exigency because of the short timeframe."

¶19 Parisi did not contest any of the scientific data set forth by the State. Nor did he contest Officer Fenhouse's testimony that obtaining a warrant required approximately two

---

[9] As the State clarified on appeal, the Rook article indicates a window of 10 to 40 minutes. Elisabeth J. Rook et al., <u>Pharmacokinetics and Pharmacokinetic Variability of Heroin and its Metabolites: Review of the Literature</u>, 1 Current Clinical Pharmacology 111 (2006).

hours.    Instead, he argued that a totality-of-the-circumstances analysis applied under <u>Missouri v. McNeely</u>, 569 U.S. ___, 133 S. Ct. 1552 (2013), and that, under the totality of the circumstances, no exigent circumstances justified the warrantless blood draw.    In particular, Parisi argued: there was no evidence the officers knew the scientific evidence the State presented; evidence of heroin's metabolites in the blood could be coupled with corroborating evidence to show possession of heroin; there were multiple officers involved with the case, so at least one of them could have attempted to obtain a search warrant; and a search warrant could have been obtained while Parisi was in the process of being medically stabilized.

¶20  The circuit court denied Parisi's motion, finding that the warrantless blood draw was constitutional because it was supported by exigent circumstances.    With regard to the elimination of heroin from the human body, the court stated:

> The study that [the State] has included . . . does indicate generally that heroin does dissipate fairly quickly from the human body.  I think it's safe to say that it dissipates quicker than that of alcohol and that the half-lives are such that the breakdown causes a fairly quick inability to detect the heroin in the blood.

However, the court refused to adopt a per se rule that the dissipation of heroin in the blood constitutes an exigent circumstance in all cases.  The court instead used a totality-of-the-circumstances analysis, relying on <u>Missouri v. McNeely</u>. The court concluded:

10

In this case, it does appear that there [were] exigent circumstances that were present here in regards to the unknown time of intake of the substance, the delay that took place in trying to determine what the defendant may or may not have taken, and what his medical condition was, the delays that were involved in regards to the treatment of him at the hospital setting, the time that it would take for obtaining the warrant, the dissipation of the heroin within the human body, and the speed in which it does that[;] so I think those are all factors in this particular case. And when the [c]ourt does look at the totality of those factors, I do think that the officer was justified in not pursuing a warrant in this case.

¶21 On September 13, 2013, Parisi pled no contest to possession of narcotic drugs; the State agreed to dismissal of the second and subsequent offense enhancer. On November 25, 2013, the court withheld sentence and placed Parisi on probation for 24 months. On May 23, 2014, Parisi filed a notice of appeal.

¶22 On January 21, 2015, the court of appeals affirmed the circuit court's judgment of conviction and denial of Parisi's suppression motion in an unpublished decision. See State v. Parisi, No. 2014AP1267-CR, unpublished slip op., ¶¶1, 12 (Wis. Ct. App. Jan. 21, 2015) (per curiam). The court of appeals upheld the search as constitutional under the good faith exception to the exclusionary rule. Id., ¶12.

¶23 The court of appeals explained that on the date that Officer Fenhouse ordered the blood drawn from Parisi, State v. Bohling, 173 Wis. 2d 529, 494 N.W.2d 399 (1993), abrogated by Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013), "was the law of this state." Parisi, unpublished slip op., ¶9.

11

Bohling, the court of appeals reasoned, "held that the dissipation of alcohol in a person's bloodstream, alone, constituted an exigent circumstance justifying a warrantless blood draw." Id. Although Bohling was later abrogated by McNeely, the court of appeals cited two of our recent cases for the proposition that "the good faith exception precludes application of the exclusionary rule where police searched a suspect's blood without a warrant in objectively reasonable reliance on Bohling." Id., ¶11 (citing State v. Kennedy, 2014 WI 132, 359 Wis. 2d 454, 856 N.W.2d 834; State v. Foster, 2014 WI 131, 360 Wis. 2d 12, 856 N.W.2d 847).

¶24 Finding "no legal difference between drawing blood to test it for alcohol or controlled drugs," the court of appeals concluded that the challenged evidence in Parisi's case was "obtained in conformity with [Bohling]" and that Kennedy and Foster were "controlling precedent applicable to this case." Id., ¶¶11-12. "Thus, regardless of whether the warrantless blood draw of Parisi may or may not have been retroactively unlawful under new United States Supreme Court precedent, the good faith exception precludes application of the exclusionary rule to exclude the evidence obtained." Id., ¶12.

¶25 On February 19, 2015, Parisi filed a petition for review in this court. On June 12, 2015, we granted the petition.

### III. STANDARD OF REVIEW

¶26 "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional

12

fact." Tullberg, 359 Wis. 2d 421, ¶27 (quoting State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463). "When presented with a question of constitutional fact, this court engages in a two-step inquiry." Id. (quoting Robinson, 327 Wis. 2d 421, ¶22). "We accept the circuit court's findings of historical fact unless they are clearly erroneous. We review the application of constitutional principles to those historical facts de novo." Foster, 360 Wis. 2d 12, ¶27 (citations omitted).

¶27 "We apply this two-step inquiry when determining whether exigent circumstances justified a warrantless search." Tullberg, 359 Wis. 2d 421, ¶28.

## IV. ANALYSIS

¶28 The Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Wis. Const. art. 1, § 11.[10] When the police draw a sample of a person's blood in order to test it for evidence of a crime, a search under the Fourth Amendment has occurred. See Tullberg, 359 Wis. 2d 421, ¶31; State v. Faust, 2004 WI 99, ¶10, 274 Wis. 2d 183, 682 N.W.2d 371. "[W]arrantless searches are per se unreasonable unless they fall within a well-recognized exception to the warrant requirement." Foster, 360 Wis. 2d 12, ¶32.

---

[10] "[T]his court interprets [these] two constitutional provisions in concert." State v. Krajewski, 2002 WI 97, ¶18 n.9, 255 Wis. 2d 98, 648 N.W.2d 385 (citations omitted).

13

¶29 The State argues, and the circuit court below agreed, that the warrantless search in this case was justified under the exigent circumstances exception to the warrant requirement. This exception "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552, 1558 (2013) (citation omitted).

¶30 Application of the exigent circumstances exception requires probable cause and exigent circumstances. See, e.g., State v. Hughes, 2000 WI 24, ¶¶17-18, 233 Wis. 2d 280, 607 N.W.2d 621 (citations omitted). See generally 44 Geo. L.J. Ann. Rev. Crim. Proc. 95 (2015) (citations omitted). The burden is on the State to establish both. Hughes, 233 Wis. 2d 280, ¶17; State v. Smith, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986), abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775. In analogous cases involving warrantless blood draws of suspected drunken drivers, we have also required that the police draw the blood in a reasonable manner, and that the suspect not raise any reasonable objections to the blood draw. See, e.g., Tullberg, 359 Wis. 2d 421, ¶31. There is no reason these two concerns should lose their relevancy in scenarios not involving drunk driving, given the familiar refrain that "[t]he touchstone of the Fourth Amendment is reasonableness." Faust, 274 Wis. 2d 183, ¶32 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). Cf. State v. Payano-Roman, 2006 WI 47, ¶38, 290 Wis. 2d 380, 714 N.W.2d 548

14

("The Fourth Amendment neither forbids nor permits all bodily intrusions. Rather, the Amendment's function is to constrain against intrusions 'which are not justified in the circumstances, or which are made in an improper manner.'" (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)).

¶31 In his petition to this court, however, Parisi does not allege that his blood was drawn in an unreasonable manner or that he offered a reasonable objection to the blood draw. Nor does he argue that the State lacked probable cause to conduct the search in question. Parisi instead contends that exigent circumstances did not support the drawing of his blood. Cf. Foster, 360 Wis. 2d 12, ¶43 n.12 ("Aside from exigency, [the defendant] does not contest that the four requirements we set forth in Bohling for conducting a lawful search and seizure of a person's blood incident to arrest were satisfied.").[11]

---

[11] In any event, we would conclude that such requirements are met in this case. First, Parisi's blood was drawn in a reasonable manner. Blood tests "are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." Schmerber v. California, 384 U.S. 757, 771 (1966) (footnote omitted). Further, the draw was conducted in a hospital by a phlebotomist. See id. ("[T]he record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices.").

Second, there is no evidence in the record that Parisi reasonably objected to the blood draw, such as "on grounds of fear, concern for health, or religious scruple." Id.

(continued)

15

¶32 Although "[a] variety of circumstances may give rise to an exigency sufficient to justify a warrantless search," McNeely, 133 S. Ct. at 1558, one "well-recognized exigent circumstance is the threat that evidence will be lost or destroyed if time is taken to obtain a warrant." State v. Bohling, 173 Wis. 2d 529, 537-38, 494 N.W.2d 399 (1993) (citation omitted).

¶33 Consequently, the State argues that, based on the limited knowledge possessed by the officers at the time, there was no time for police to obtain a warrant before performing a draw of Parisi's blood because Parisi's body was rapidly metabolizing any heroin he may have taken and because the "best evidence of heroin use" would therefore have been gone before a warrant was secured.

¶34 In response, Parisi presents three challenges to the circuit court's determination that exigent circumstances existed

---

Third, there was "a 'fair probability' that contraband or evidence of a crime [would] be found in" Parisi's blood. State v. Tullberg, 2014 WI 134, ¶33, 359 Wis. 2d 421, 857 N.W.2d 120; State v. Hughes, 2000 WI 24, ¶21, 233 Wis. 2d 280, 607 N.W.2d 621. One of the roommates found Parisi having difficulty breathing, and the police, responding to the medical call, found Parisi on the floor and surrounded by vomit. Officer Fenhouse testified that Parisi reacted positively to the administration of Narcan, a drug which Officer Fenhouse knew was used to counteract the effects of heroin overdose. While at the hospital, Officer Fenhouse was told by officers still at the residence that "there was evidence of drug use." Police at the residence in fact uncovered evidence of drug use. "[U]nder the totality of the circumstances," Tullberg, 359 Wis. 2d 421, ¶34, Officer Fenhouse had probable cause to believe that Parisi's blood contained evidence that Parisi had used heroin.

in this case: (1) evidence of heroin use remains detectable in the human body for "many hours, or even days"; (2) the officers could have, but did not attempt to obtain a warrant before conducting the blood draw at issue; and (3) because this is not a drunk driving case, Parisi's Fourth Amendment protections were not "relaxed."

¶35 When examining whether exigent circumstances premised on the imminent destruction of evidence justified a warrantless search, we employ an objective test: "Whether a police officer under the circumstances known to the officer at the time reasonably believes that delay in procuring a warrant would . . . risk destruction of evidence." Smith, 131 Wis. 2d at 230, abrogated on other grounds by Felix, 339 Wis. 2d 670; see also Bohling, 173 Wis. 2d at 538 (citation omitted); Schmerber v. California, 384 U.S. 757, 770 (1966) (citing Preston v. United States, 376 U.S. 364, 367 (1964)).

A. Whether Exigent Circumstances Existed

¶36 The State has sufficiently established that an officer in this case, under the circumstances known to him or her at the time, might reasonably have believed that the delay necessary to obtain a warrant would have risked destruction of evidence.

¶37 The officers in this case were confronted with a medical emergency in which there were several unknown facts. The officers did not know with certainty what Parisi had ingested and, once heroin was suspected, did not know when he had ingested it or how much he had ingested.

17

¶38 Based on the uncontested evidence before it, which indicated that both heroin and its first metabolite could become undetectable in blood plasma in as little as one hour, the circuit court concluded that heroin "dissipates quicker than . . . alcohol" and that "the breakdown causes a fairly quick inability to detect . . . heroin in the blood." The court rested its finding of exigent circumstances in part on "the dissipation of . . . heroin within the human body, and the speed in which it does that." Given the data in the Rook article, these findings were not clearly erroneous. See State v. Popke, 2009 WI 37, ¶20, 317 Wis. 2d 118, 765 N.W.2d 569 (under clearly erroneous standard, "we are bound not to upset the trial court's findings of historical or evidentiary fact unless they are contrary to the great weight and clear preponderance of the evidence" (citation omitted)).

¶39 Further, in Officer Fenhouse's experience, obtaining a warrant took approximately two hours. The circuit court implicitly found Officer Fenhouse's undisputed testimony regarding the time required to obtain a warrant credible, because the circuit court referenced Officer Fenhouse's testimony in its ruling[12] and based its ruling in part on "the time that it would take for obtaining the warrant," while Officer Fenhouse provided the only testimony regarding the time

---

[12] The circuit court stated, "The officer did testify as to his experience in regards to trying to obtain and obtaining search warrants in the past."

18

needed to obtain a warrant. See State v. Echols, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993) ("A trial court is not required to recite 'magic words' to set forth its findings of fact. An implicit finding of fact is sufficient when the facts of record support the decision of the trial court." (citations omitted)); see also id. at 673 ("When a trial court does not expressly make a finding necessary to support its legal conclusion, an appellate court can assume that the trial court made the finding in the way that supports its decision." (citation omitted)). This finding was also not clearly erroneous. See Popke, 317 Wis. 2d 118, ¶20 (citation omitted).

¶40 Finally, Parisi's health was unstable. At the hospital, "[hospital staff] were tending to him and then it seemed things were getting better and then it would deteriorate again." Under the circumstances, Officer Fenhouse might reasonably have feared that if he attempted to obtain a warrant before drawing Parisi's blood, Parisi's condition could again lapse, causing Officer Fenhouse to miss his window of opportunity. Cf. Tullberg, 359 Wis. 2d 421, ¶48 (deputy sheriff investigating drunk driver performed blood draw in part because hospital staff planned to perform a CT scan and because the deputy sheriff did not know whether the CT scan would lead to subsequent medical treatment).

¶41 Given all of these factors——the multiple unknown facts, the rapid dissipation of heroin in the blood, the time needed to obtain a warrant, and Parisi's unstable condition—— "[t]he officer in the present case . . . might reasonably have

19

believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"  Schmerber, 384 U.S. at 770 (citation omitted).  Critical evidence of heroin use in Parisi's body was disappearing by the minute, and had been since an unknown time that evening.  Officer Fenhouse could reasonably conclude that waiting two hours for acquisition of a warrant, with no guarantee that Parisi would be available for a blood draw once a warrant was acquired, would mean loss of access to that evidence.

¶42 Before proceeding, we take a moment to emphasize that this case does not establish a per se rule that the dissipation of heroin in the blood always constitutes an exigency justifying a warrantless blood draw.  We instead resolve this case "based 'on its own facts and circumstances.'"  McNeely, 133 S. Ct. at 1559 (citations omitted).  Any number of factual variations might change the result in a future case: police might initially have more facts at their disposal, such as the type and amount of an ingested drug, as well as the time it was ingested; other jurisdictions might allow for more rapid acquisition of search warrants; scientific evidence on heroin dissipation may become clearer in the future; and so on.

B.    Whether the Presence of Morphine in Parisi's Blood
      Precludes a Finding of Exigent Circumstances

¶43 Before the circuit court, Parisi did not object to admission of the Rook article and did not provide any scientific evidence of his own.  Indeed, Parisi concedes on appeal, "Heroin

20

converts to its first metabolite, 6-[mono]acetylmorphine[,] within a few minutes. 6-[mono]acetylmorphine then converts to morphine. 6-[mono]acetylmorphine is detectable in plasma for 1-3 hours after heroin use."[13]

¶44 Citing the Rook article, however, Parisi argues that because morphine resulting from the metabolism of heroin "remains in the system for many hours after heroin use," exigent

---

[13] Parisi has provided further scientific evidence for the first time on appeal before this court in the appendix to his brief. In particular, Parisi cites a scientific article which was not before the circuit court for the proposition that 6-monoacetylmorphine is detectable in urine for an average of five hours and as much as 34.5 hours. See Alain G. Verstraete, Detection Times of Drugs of Abuse in Blood, Urine, and Oral Fluid, 26 Therapeutic Drug Monitoring 200 (2004) ("Verstraete article"). The passage relied upon states, "After administration of 3, 6, and 12 mg heroin intravenously, 6-acetylmorphine is detectable in urine during respectively 2.3, 2.6, and 4.5 hours. . . . In the Lübeck study, 6-acetylmorphine . . . was detectable for 5 hours on average (maximum 34.5 hours) . . . in urine." Id. at 203. In contrast, the Rook article states, "6-monoacetylmorphine was detectable for 1.2-4.3 hrs in urine after intravenous injection or inhalation of 2.6-20 mg heroin." Rook, supra, at 111. Based on the evidence, then, 6-monoacetylmorphine can become undetectable in urine in as little as 1.2 to 2.3 hours, as opposed to the Rook article's indication that 6-monoacetylmorphine can become undetectable in blood in as little as one hour. Id. Parisi's article does not affect our analysis. Even assuming that an involuntary urine test was feasible in this case——a contention the State questions——the amount of time before 6-monoacetylmorphine is potentially undetectable in urine is not materially different for our purposes from the amount of time before 6-monoacetylmorphine is potentially undetectable in blood.

circumstances did not exist.[14] Parisi points out that morphine was found in Parisi's blood sample, which was drawn "almost two and a half hours after police encountered him." He agrees that morphine indicates that a person used either heroin or morphine, but argues:

> Because the presence of drugs in blood is not sufficient by itself to support a conviction of possessing a controlled substance, any blood test result would be coupled with other corroborating evidence from the case in order to convict. State v. Griffin, 220 Wis. 2d 371, 381, 584 N.W.2d 127 (Ct. App. 1998). That other evidence in a case will inform which of [the] two Schedule 1 narcotics, heroin or morphine, the individual unlawfully consumed.

¶45 The flaws in Parisi's reasoning are two-fold. First, the test we use to analyze whether or not exigent circumstances exist is an objective one based on "the circumstances known to the officer at the time," Smith, 131 Wis. 2d at 230, and although an officer might reasonably have believed that a two-hour delay would risk the destruction of evidence in this case because of, among other things, the rapid dissipation of heroin in the blood, it is not clear that an officer would have knowledge of the specific metabolic processes involved subsequent to ingestion of heroin, or the specific rates of each. Whether morphine was eventually found in Parisi's blood

---

[14] We do not possess, but do not require, information regarding precisely how long morphine remains in the human body after ingestion of heroin. According to the State, the Rook article indicates that "one quarter of the morphine [that was initially in the blood] can still be detected . . . about three to nine hours later."

is not relevant to what a police officer might reasonably have believed prior to conducting the blood draw. See State v. Jennifer Parisi, 2014 WI App 129, ¶12, 359 Wis. 2d 255, 857 N.W.2d 472 ("The exigent circumstances exception . . . does not require that officers observe actual destruction of evidence . . . . The exception rather requires only that officers have a reasonable belief 'that delay in procuring a search warrant would risk destruction of evidence.'" (citing Hughes, 233 Wis. 2d 280, ¶24)).

¶46 Second, even assuming for the sake of argument that a reasonable police officer knows that heroin is detectable in blood as morphine for several hours after ingestion, the officer in this case did not know what corroborating evidence of heroin or morphine use police would ultimately find, or what alibis Parisi might raise. Parisi might have a plausible defense to a charge based on heroin found in the residence and morphine found in his blood, but no defense to a charge based on heroin found in the residence and heroin or 6-monoacetylmorphine found in his blood. In other words, heroin or its first metabolite, 6-monoacetylmorphine, remained the most probative evidence that Parisi had used heroin.

¶47 Parisi argues that "this Court will be making new law if it adopts the [S]tate's argument that no warrant is required when seeking one will risk the destruction of the 'best evidence.'" Parisi instead contends that McNeely dictates application of the exigent circumstances exception "when waiting

23

for a warrant means the only evidence of the crime may be destroyed."

¶48 We do not agree with Parisi's reading of McNeely. The McNeely court held that, "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." McNeely, 133 S. Ct. at 1561 (emphasis added). Here, assuming that an officer possessed full knowledge of the manner in which heroin is metabolized, the officer could reasonably believe that waiting two hours to obtain a warrant would "significantly undermin[e] the efficacy" of a blood draw by leading to ambiguous test results; evidence of heroin or morphine use, rather than of heroin use alone, might result if sufficient time has passed (this was in fact the result in this case). Depending on the corroborating evidence eventually obtained in the case, and testimony given by the defendant or other witnesses, the State might not be able to prove illegal possession of any drug.

¶49 The McNeely court also alluded to a "best evidence" approach when it stated:

> While experts can work backwards from the [blood alcohol concentration] at the time the sample was taken to determine the [blood alcohol concentration] at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation. For that reason, exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process.

24

Id. at 1563.  In other words, a warrantless blood sample may be justified even where an inferior form of evidence may be available.  Chief Justice John Roberts, joined by Justices Stephen Breyer and Samuel Alito, was even more forceful:

> McNeely contends that there is no compelling need for a warrantless blood draw, because . . . the State can use math and science to work backwards and identify a defendant's [blood alcohol concentration] at the time he was driving.  But that's not good enough.  We have indicated that exigent circumstances justify warrantless entry when drugs are about to be flushed down the toilet.  We have not said that, because there could well be drug paraphernalia elsewhere in the home, or because a defendant's co-conspirator might testify to the amount of drugs involved, the drugs themselves are not crucial and there is no compelling need for warrantless entry.
>
> The same approach should govern here.  There is a compelling need to search because alcohol——the nearly conclusive evidence of a serious crime——is dissipating from the bloodstream.  The need is no less compelling because the police might be able to acquire second-best evidence some other way.

Id. at 1571 (Roberts, C.J., concurring in part and dissenting in part) (footnote omitted) (citations omitted).  See also State v. Peardot, 119 Wis. 2d 400, 404, 351 N.W.2d 172 (Ct. App. 1984) ("Exigent circumstances existed here.  The marked currency was the best evidence linking defendant with the sale of the LSD. If the police had not moved quickly, defendant could easily have disposed of the money in any of several ways." (emphasis added)).

¶50 In sum, the fact that morphine remains in the body for several hours after the ingestion of heroin does not mean that it would be unreasonable for Officer Fenhouse to believe that

taking the time to obtain a search warrant in this case risked destruction of evidence of heroin use.[15]

C.    Whether a Finding of Exigent Circumstances is Precluded Because this is not a Drunk-Driving Case

¶51 Finally, Parisi notes that in both Bohling and McNeely, the public safety risk presented by drunk-driving was balanced against the defendant's privacy interest "in preventing an agent of the government from piercing his skin." McNeely, 133 S. Ct. at 1565.

¶52 In Bohling, we noted in passing, "[O]ur interpretation of Schmerber makes sense from a policy standpoint. It strikes a

---

[15] For all of the reasons discussed, we reject Parisi's arguments that a warrant could have been pursued because of (1) the number of officers involved in this case (five to seven officers) and (2) the delay that occurred while hospital staff stabilized Parisi. Officer Fenhouse could reasonably believe that asking another officer to obtain a warrant would be futile, given the short timeframe before evidence of heroin use disappeared. For instance, if officers suspect drugs are being flushed behind a closed door, see, e.g., Kentucky v. King, 563 U.S. 452 (2011), the exigency is not eliminated merely because there are multiple officers at the scene. See United States v. Fiasche, 520 F.3d 694, 698 (7th Cir. 2008).

Similarly, Officer Fenhouse had no way of knowing, at the hospital at 1:55 a.m., that Parisi would be unavailable for a blood draw until 3:10 a.m. Based on Officer Fenhouse's testimony, it is unlikely that a warrant process begun at 1:55 a.m. would have been completed by 3:10 a.m. anyway. It was not so unreasonable as to render the blood draw unconstitutional for Officer Fenhouse to fail to begin the warrant process when Parisi's health lapsed. "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." King, 563 U.S. at 466 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).

favorable balance between an individual's right to be free from unreasonable searches and Wisconsin's interest in enforcing its drunk driving laws. Wisconsin's interest is vital whereas the resulting intrusion on individual privacy is minimal." Bohling, 173 Wis. 2d at 545. Further, we recognized that "in the context of driving on public highways, public safety concerns reduce a driver's expectation of privacy." Id. at 541.

¶53 In McNeely the Supreme Court likewise acknowledged both "the compelling governmental interest in combating drunk driving" and "the fact that people are 'accorded less privacy in . . . automobiles because of th[e] compelling governmental need for regulation.'" McNeely, 133 S. Ct. at 1565 (alteration in original) (quoting California v. Carney, 471 U.S. 386, 392 (1985)). The Court also stated that "a blood test conducted in a medical setting by trained personnel . . . is concededly less intrusive than other bodily invasions we have found unreasonable," while adding that "any compelled intrusion into the human body implicates significant, constitutionally protected privacy interests." Id. At bottom, however, the Court found no reason to depart from "the traditional Fourth Amendment totality-of-the-circumstances analysis to determine whether an exigency justified a warrantless search." McNeely, 133 S. Ct. at 1565-66.

¶54 Here, Parisi argues that he "never operated a vehicle or put anyone other than himself at risk. . . . Heroin use is dangerous[,] but if the user does not get behind the wheel, the threat it poses is to the person who uses it, not to the public

27

at large. . . . [T]he warrant requirement should not be 'relaxed' in [t]his case as it is in drunk driving cases."

¶55 We agree that, because this is not a case involving intoxicated driving, the reduced privacy interest in such cases does not apply. Likewise, we agree that the governmental interest in preventing intoxicated driving is less relevant because Parisi was not found driving a vehicle. But these considerations only carry Parisi so far. It does not follow that, because Parisi's privacy interests are somewhat greater in this case than if he had been stopped on a highway, we must therefore abandon our totality-of-the-circumstances analysis and the exigent circumstances exception to the warrant requirement.

¶56 Our discussion of a "relaxed" warrant requirement in the context of driving on state highways supported our conclusion that Schmerber created a per se rule that dissipation of alcohol alone constitutes an exigency. Bohling, 173 Wis. 2d at 539-40. But Bohling was later abrogated by the Supreme Court's McNeely decision, as were the decisions of other state supreme courts. See Bohling, 173 Wis. 2d 529, abrogated by McNeely, 133 S. Ct. 1552; State v. Shriner, 751 N.W.2d 538 (Minn. 2008), abrogated by McNeely, 133 S. Ct. 1552; State v. Woolery, 116 Idaho 368 (1989), abrogated by McNeely, 133 S. Ct. 1552.

¶57 In McNeely the Court explained that without a warrant, "'the fact-specific nature of the reasonableness inquiry' demands that we evaluate each case of alleged exigency based 'on its own facts and circumstances.'" McNeely, 133 S. Ct. at 1559

28

(citations omitted).  Schmerber, the Court continued, "applied this totality of the circumstances approach. . . .  [W]e considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts."  Id. at 1559-60.

¶58  The question Parisi essentially raises is whether the search at issue was "unreasonable" simply because this is not a drunk driving case.  U.S. Const. amend. IV; Wis. Const. art. 1, § 11.  In effect, Parisi is asking for a per se rule of his own.  Instead, taking our cue from McNeely, we analyze this case on its facts.  Parisi unquestionably possessed "significant, constitutionally protected privacy interests" in avoiding the warrantless, nonconsensual blood draw that occurred in this case.  McNeely, 133 S. Ct. at 1565.  But that Parisi never used a car in this case does not thereby elevate his privacy interests to such heights as to render any warrantless blood draw under exigent circumstances unreasonable.  Cf. Payano-Roman, 290 Wis. 2d 380, ¶38 ("The Fourth Amendment neither forbids nor permits all bodily intrusions.  Rather, the Amendment's function is to constrain against intrusions 'which are not justified in the circumstances, or which are made in an improper manner.'" (quoting Winston, 470 U.S. at 760).

¶59 The warrantless blood draw at issue was justified under the circumstances, regardless of the presence or not of an automobile.  As we have already determined, under the facts of this case, the police reasonably feared destruction of evidence of a crime.  Further, "[t]he intrusion in the usual blood draw

29

is slight," State v. Krajewski, 2002 WI 97, ¶60,255 Wis. 2d 98, 648 N.W.2d 385, and the draw in this case was performed reasonably, in a hospital by a phlebotomist. Finally, we would be remiss if we failed to recognize the State's own compelling interest in countering heroin use and addiction. Cf. State v. Peck, 143 Wis. 2d 624, 634, 422 N.W.2d 160 (1988) ("Preservation of the public health and safety is the obvious purpose underlying Wisconsin's drug laws, and we see a compelling state purpose in the regulation of marijuana and other controlled substances.")[16] Adoption of Parisi's argument would lead to the

---

[16] Heroin use and addiction is a problem that has become a state and national epidemic. See, e.g., Jerry L. Halverson, Michael M. Miller, and George L. Morris, We Have a Heroin and Opioid Problem; Let's Fix It, Milwaukee Journal Sentinel, Aug. 16, 2015, http://www.jsonline.com/news/opinion/we-have-a-heroin-and-opioid-problem-lets-fix-it-b99556485z1-321917961.html; Kathleen Hennessey, Obama: U.S. Will Tackle 'Epidemic' of Heroin, Prescription Drug Abuse, NBC New York, Oct. 21, 2015, http://www.nbcnewyork.com/news/national-international/Obama-Prescription-Drug-Abuse-Epidemic-335251301.html; Nate Beck, Former UWO Athlete Guilty of Homicide-By-Heroin, Oshkosh Northwestern, Dec. 17, 2015, http://www.thenorthwestern.com/story/news/crime/2015/12/17/former-uwo-athlete-guilty-homicide--heroin/77493166/ ("Though attorneys sparred over the timeline of events that led to [the] overdose, neither disputed heroin's grip on Winnebago County.").

From 2002 to 2013 "the rate of heroin-related overdose deaths [in the United States] nearly quadrupled, according to the Centers for Disease Control and Prevention." The Numbers Behind America's Heroin Epidemic: A Guide to the Drug's Spread and Impact, N.Y. Times, Oct. 30, 2015, http://www.nytimes.com/interactive/2015/10/30/us/31heroin-deaths.html?_r=0. In Wisconsin, "the number of overdose deaths annually involving prescription painkillers and heroin now exceeds the number of traffic fatalities." Halverson, supra.

(continued)

30

We vigorously reject any suggestion that "the threat [heroin] poses is to the person who uses it, not to the public at large."  The heroin epidemic is destroying lives across the country, and not just those of heroin users.  See, e.g., Krystle Kacner, "It's a Nightmare:" Menomonee Falls Father Wants to Help Others After Son Dies of Overdose," Fox6 News, Nov. 17, 2015, http://fox6now.com/2015/11/17/its-a-bloody-nightmare-menomonee-falls-father-wants-to-help-others-after-son-dies-of-overdose/.  Kacner's article features the father of a 22-year old who died from a heroin overdose.  According to Kacner, the father is "living proof that the addict's life may not be the only thing the drug takes.  'We got divorced, went bankrupt, foreclosure, lost the company.  . . .  It's terrible for the other children——not only losing a brother, but going through the addiction process——because they don't get the attention growing up that they deserved.'"  See also Deborah Sontag, Heroin's Small-Town Toll, and a Mother's Grief, N.Y. Times, Feb. 10, 2014, http://www.nytimes.com/2014/02/11/us/heroins-small-town-toll-and-a-mothers-pain.html (discussing story of woman from Hudson, Wisconsin, whose 21-year-old daughter "was a heroin abuser" and died after overdosing on "a mix of drugs" in 2013).  Federal data show that nearly 20 percent of those who died from heroin in 2010 were ages 15 to 24.  Id.

The Wisconsin Legislature is working to address the heroin problem in our state.  See, e.g., Jessie Opoien, Led by State Rep. John Nygren, Wisconsin Families Caught in Heroin's Grasp Fight Back, The Capital Times, Dec. 2, 2015, http://host.madison.com/ct/news/local/govt-and-politics/led-by-state-rep-john-nygren-wisconsin-families-caught-in/article_640a242f-91d6-5dd6-a8c4-ca46a14304d8.html.  Wisconsin State Representative John Nygren, whose own daughter struggled with heroin addiction,

> has become the Wisconsin Legislature's torchbearer for combating the state's heroin and opiate epidemic.  In 2014, he ushered a package of bills aimed at curbing heroin abuse and deaths through the Legislature with unanimous support.  In September, he introduced a second package focusing on prescription painkillers.  As the crisis has deepened, other politicians and affected families have gotten involved.

Id.

31

loss of police access to critical evidence in countless situations in which obtaining a warrant in time is simply not practical, through no fault of the officers seeking the evidence. Cf. McNeely, 133 S. Ct. at 1561. That this case is distinguishable from Bohling and McNeely on the ground that Parisi did not operate a vehicle does not make the drawing of his blood automatically unreasonable.

## V. CONCLUSION

¶60 We conclude that the blood draw in this case was constitutional because it was supported by exigent circumstances. We therefore need not address whether the good faith exception to the exclusionary rule also applies in this case. See State v. Tullberg, 2014 WI 134, ¶¶4-5, 359 Wis. 2d 421, 857 N.W.2d 120 (declining to address State's argument that the good faith exception to the exclusionary rule justified warrantless blood draw where blood draw had been found constitutional under exigent circumstances doctrine).

*By the Court.*—The decision of the court of appeals is affirmed.

¶61 ANN WALSH BRADLEY, J. *(dissenting).* The primary issue addressed by the majority is whether Parisi's warrantless blood draw is an exigent circumstance justifying an exception to the warrant requirement. If it is not, then the warrantless blood draw was a violation of the Fourth Amendment of the United States Constitution and the evidence obtained must be suppressed.

¶62 All agree that absent an emergency, search warrants are required for intrusions into the human body. Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (citing Schmerber v. California, 384 U.S. 757, 770 (1966)).

¶63 Likewise, it is undisputed that pursuant to McNeely a per se rule authorizing warrantless blood draws based on dissipation of evidence in the bloodstream is prohibited under the Fourth Amendment. See id. Nevertheless, the majority creates a per se rule by inventing a new best evidence rule for every heroin case, concluding that exigent circumstances exist due to the rapid speed at which heroin dissipates in the blood.

¶64 Not only does the majority opinion disregard McNeely's prohibition of a per se rule based on dissipation, it also ignores the circumstances under which McNeely directs that the police must always obtain a warrant. McNeely instructs that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561.

¶65 Contrary to the majority, I conclude that the State has failed to show there were exigent circumstances justifying an exception to the warrant requirement. During the approximately two and one-half hours available, at least one of the five to seven officers involved in the investigation could have and should have obtained a warrant. The warrantless blood draw violated Parisi's Fourth Amendment rights and the evidence resulting from it should be suppressed.[1] Therefore, I respectfully dissent.

I.

¶66 The majority determines that the circuit court's finding of exigent circumstances based on "the dissipation of . . . heroin within the human body, and the speed in which it does that" were not clearly erroneous. Majority op. ¶38. According to the majority, "critical evidence of heroin use in Parisi's body was disappearing by the minute, and had been since an unknown time that evening." Majority op. ¶41.

---

[1] Parisi asserts a violation of both the Fourth Amendment to the U.S. Constitution and a violation of Article I, § 11 of the Wisconsin Constitution. When we refer to the Fourth Amendment in this discussion, we intend the discussion to be equally applicable to Article I, § 11 of the Wisconsin Constitution. "Generally, we have interpreted provisions of the Wisconsin Constitution consistent with the United States Supreme Court's interpretation of their counterparts in the federal constitution. However, on occasion, we have interpreted a provision in the Wisconsin Constitution more broadly than the United States Supreme Court has interpreted a parallel provision in the United States Constitution." State v. Arias, 2008 WI 84, ¶19, 311 Wis. 2d 358, 752 N.W.2d 748 (citations omitted).

¶67 Repeatedly, the majority focuses on dissipation. See, e.g., majority op. ¶45 ("a two-hour delay would risk the destruction of evidence in this case because of, among other things, the rapid dissipation of heroin in the blood"); see also majority op. ¶48 ("waiting two hours to obtain a warrant would 'significantly undermin[e] the efficacy' of a blood draw by leading to ambiguous test results; evidence of heroin or morphine use, rather than heroin use alone, might result if sufficient time has passed"); majority op. ¶50 ("the fact that morphine remains in the body for several hours after the ingestion of heroin does not mean that it would be unreasonable for Officer Fenhouse to believe that taking the time to obtain a search warrant in this case risked destruction of evidence of heroin use").

¶68 In asserting that the rapid dissipation of heroin is an exigent circumstance, the majority relies on scientific literature provided by the State. See Elisabeth J. Rook et al., Pharmacokinetics and Pharmacokinetic Variability of Heroin and its Metabolites: Review of the Literature, 1 Current Clinical Pharmacology 109, 111 (2006). Of particular import is the scientific evidence that "[h]eroin converts to its first metabolite, 6-[mono]acetylmorphine[,] within a few minutes. 6-[mono]acetylmorphine then converts to morphine. 6-[mono]acetylmorphine is detectable in plasma for 1-3 hours after heroin use." Majority op. ¶43. According to the majority, heroin or its first metabolite, 6-monoacetylmorphine, are the

most probative evidence of heroin use and therefore the best evidence. Majority op. ¶46.

¶69 The majority concedes that morphine is evidence of heroin use that remains in the blood for hours after heroin and 6-monoacetylmorphine dissipate. See, e.g., majority op. ¶50. Nevertheless, it rejects this evidence as not being sufficiently probative.[2] Consequently, the majority creates a best evidence rule in heroin cases.

¶70 Oddly, the majority ends up arguing that the very evidence of morphine the State wishes to preserve in the suppression motion is really not good enough because it is less probative than heroin or 6-monoacetylmorphine. Majority op. ¶46. It contends, "Parisi might have a plausible defense to a charge based on heroin found in the residence and morphine found in his blood, but no defense to a charge based on heroin found in the residence and heroin or 6-monoacetylmorphine found in his blood." Majority op. ¶46.

II.

_____

[2] The majority goes to such lengths to minimize the evidentiary value of morphine in the blood that it does not even bother to determine how long morphine is detectable after heroin use. According to the majority: "We do not possess, but do not require, information regarding precisely how long morphine remains in the human body after ingestion of heroin." Majority op. ¶44 n.14.

The majority is incorrect. At oral argument, Parisi's counsel explained that according to the Rook article supplied by the State, "the metabolites of heroin stay in the system for 12, could be even 24 hours..."

4

¶71 In our prior decisions, this court properly recognized that McNeely "changed the landscape of warrantless blood draws in Wisconsin." State v. Tullberg, 2014 WI 134, ¶42, 359 Wis. 2d 421, 857 N.W.2d 120; see also State v. Kennedy, 2014 WI 132, ¶29, 359 Wis. 2d 454, 856 N.W.2d 834 ("in 2013, the United States Supreme Court issued its decision in McNeely, effectively abrogating our holding in Bohling that the rapid dissipation of alcohol alone constitutes an exigent circumstance sufficient for law enforcement officers to order a warrantless investigatory blood draw.").[3] In Kennedy, this court concluded that under McNeely, "the Fourth Amendment does not allow such per se rules in the context of warrantless investigatory blood draws." 359 Wis. 2d 454, ¶29 (citing McNeely, 133 S. Ct. at 1561).

¶72 Despite this court's prior adherence to McNeely, the cornerstone of the majority's opinion rests on its repeated assertion that the rapid dissipation of heroin in the blood

---

[3] Bohling makes clear that it is specific to the drunk driving context. It stated that "a warrantless blood sample taken at the direction of a law enforcement officer is permissible under the following circumstances: (1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there is a clear indication that the blood draw will produce evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw." State v. Bohling, 173 Wis. 2d 529, 533-34, 494 N.W.2d 399 (1993) (emphasis added) abrogated by Missouri v. McNeely, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013).

The majority opinion fails to accurately state these requirements. It omits the first factor, which provides an essential distinction between Bohling and this case. See majority op. ¶31 & n.11.

5

risks the destruction of evidence. See, e.g., majority op. ¶¶40-45. Yet, the majority admonishes that this case "does not establish a per se rule that the dissipation of heroin in the blood always constitutes an exigency justifying a warrantless blood draw." Majority Op. ¶42.

¶73 Contrary to the above admonition, the author of the majority opinion got it right at oral argument. The State's argument, which the majority now adopts, is really "Bohling for heroin":

> Justice Ziegler: Ok, but it has never been the law that just because evidence is really good, you don't need a warrant. That's almost what you are saying and you are losing me on that.
>
> Counsel for the State: ... What I am saying is that because this really good evidence, this really probative evidence dissipates so quickly, at least in the case of heroin, and the public defender brought up some other drugs like marijuana and things like that, this is a whole different animal. I agree if this is a marijuana case, we would be done. We would be done because marijuana being a natural substance-cocaine being a natural substance-it doesn't break down. Heroin is a not natural substance-it's a synthetic and it does break down. That is why you need to get the evidence quickly. And that is why you have exigent circumstances because you need to get it quickly.
>
> Justice Ziegler: So to be clear, you are basically asking us to revive Bohling in terms of heroin cases or substances that are not natural.
>
> ... [W]hat I really hear you saying is that in heroin cases there is an exigency because it dissipates so quickly. That's Bohling for heroin, isn't it?

¶74 The majority now asserts that "[w]e instead resolve this case 'based on its own facts and circumstances.'" Majority op. ¶42. Yet, all of the facts and circumstances the majority

6

discusses relate only to dissipation: the type and amount of an ingested drug, the time it was ingested, the time it takes to get a warrant in relation to dissipation, and scientific evidence on the rapid dissipation of heroin. Id. Its best evidence rule places the focus on facts and circumstances relating only to dissipation. By inventing a best evidence rule for every heroine case and concluding that exigent circumstances exist because of the rapid dissipation of heroin, the majority creates a per se rule for heroin cases.

¶75 If the majority is correct that heroin is in the blood for only a few minutes and 6-monoacetylmorphine is present in the blood for only one to three hours before metabolizing into morphine, this would be the circumstance in every case.[4] Even if the scientific evidence regarding the rate of dissipation changed, it would change for every case.

¶76 Likewise, the time it takes to obtain a warrant will always cause some delay in every case. In this case, Officer Fenhouse testified that that it takes approximately two hours to obtain a search warrant. Majority op. ¶14. However, McNeely sounds a note of caution, explaining that consideration of the time it takes to obtain a warrant "might well diminish the incentive for jurisdictions to pursue progressive approaches to warrant acquisition that preserve the protections afforded by

---

[4] The majority opinion dismisses the scientific articles Parisi submitted and instead relies on a solo article submitted by the State. See majority op. ¶43 n.13.

the warrant while meeting the legitimate interests of law enforcement." McNeely, 133 S. Ct. at 1563 (citations omitted).

¶77 Underlying the majority's conclusion that the rate of dissipation of heroin in the blood justifies an exception to the warrant requirement is the majority's newly minted best evidence rule for heroin cases. According to the majority, "the officer could reasonably believe that waiting two hours to obtain a warrant would 'significantly undermin[e] the efficacy' of a blood draw by leading to ambiguous test results; evidence of heroin or morphine use, rather than heroin use alone, might result if sufficient time has passed." Majority op. ¶48.

¶78 The majority errs in its creation of a best evidence rule for heroin cases. It contradicts well-established law when it contends that a blood draw showing "heroin or its first metabolite, 6-monoacetylmorphine, remained the most probative evidence that Parisi had used heroin."[5] Majority Op. ¶46. "Neither Wisconsin law nor federal law recognizes a 'best evidence rule' that established a hierarchy of evidence. In effect, all evidence is created equal." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 1001.1 at 928

---

[5] The majority fails to adequately explain its singular focus of needing to find heroin——not morphine——in the blood. Parisi was charged with Possession of a Schedule I or II narcotic drug. Wis. Stat. § 961.41(3g)(am) provides that: "If a person possesses or attempts to possess a controlled substance included in schedule I or II which is a narcotic drug... the person is guilty of a Class I felony." Even if the police had only been able to convict Parisi of possession of morphine, both heroin and morphine carry the same criminal penalty. See Wis. Stat. §§ 961.14(3)(k) and 961.16(2)(a)10.

8

(3rd ed. 2008) (explaining the "myth of the best evidence rule").

¶79 Even if there were a best evidence rule, evidence of drugs in the bloodstream alone is not enough to support a possession charge. Here, Parisi was charged with possession of a schedule I or II narcotic drug. In Wisconsin, "the mere presence of drugs in a person's system is insufficient to prove that the drugs are knowingly possessed by the person or that the drugs are within the person's control." State v. Griffin, 220 Wis. 2d 371, 381, 584 N.W.2d 127 (1998). Evidence of drugs in the bloodstream is "circumstantial evidence of prior possession" and must be "combined with other corroborating evidence of sufficient probative value" in order to prove possession. Id.

¶80 The majority's reasoning is flawed because even if the police had been able to detect heroin or its first metabolite 6-monoacetylmorphine in the bloodstream, they still would need corroborating evidence to convict Parisi of heroin possession. In this case, police found "a bindle of what looked to be heroin wrapped in tinfoil, some cut ends, and [a] marijuana pipe" at the scene of the overdose. Majority op. ¶10. Additionally, Parisi was given Narcan before he was transported to the hospital, which Officer Fenhouse knew was "usually administered for people who have overdosed on heroin." Majority op. ¶7. Thus, the heroin found in the apartment where Parisi overdosed and the fact that he was treated with Narcan present key corroborating evidence.

9

¶81 The majority's reliance on McNeely for support of a best evidence rule is misplaced. The term "best evidence" does not appear in the McNeely majority opinion. Additionally, there are distinctions between the presence of alcohol in the bloodstream and the presence of heroin.

¶82 Evidence of heroin or 6-monoacetylmorphine in the bloodstream is less probative than evidence of alcohol in the bloodstream because a BAC level alone is enough to obtain a drunk driving conviction. In contrast, evidence of drug use in the blood stream requires corroborating evidence for a possession conviction. Moreover, the amount of alcohol in the blood is relevant to a conviction, but the amount of heroin in the blood is not. Unlike a BAC level, the police need find only a trace of heroin or its metabolites in the bloodstream.

¶83 In State v. Jones the Nevada Supreme Court articulated this distinction. It determined that the dissipation of cocaine in the defendant's bloodstream was not an exigent circumstance that justified a departure from the normal procedure of obtaining a warrant. 895 P.2d 643, 644 (1995). The Jones court explained that evidence of alcohol and drugs in the blood differ. Id. That analysis is applicable here: "a conviction for driving under the influence requires a specific minimum concentration of blood alcohol, whereas a conviction for being under the influence of a controlled substance requires only a trace amount of the substance or its metabolites." Id.

¶84 The majority also misunderstands State v. Peardot, 119 Wis. 2d 400, 351 N.W.2d 172 (1984), when it cites to that case

10

as support for the adoption of a best evidence rule. The term "best" was used merely as an adjective to describe the evidence. There is no discussion in Peardot supporting the adoption of a best evidence approach.

¶85 Finally, the majority's insistence that evidence of morphine in the bloodstream is less probative evidence than heroin or 6-monoacetylmorphine ignores the facts of this case. The warrantless blood draw performed on Parisi revealed evidence of morphine in his bloodstream, not heroin or 6-monoacetylmorphine. It is this very evidence of morphine in Parisi's bloodstream that the State seeks to use and Parisi seeks to suppress.

III.

¶86 Not only did McNeely reject a per se rule based on dissipation, it also set forth circumstances in which the police must obtain a warrant without exception. 133 S. Ct. at 1561. McNeely instructs that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id.; see also Tullberg, 359 Wis. 2d 421, ¶42.

¶87 In a footnote, the majority rejects Parisi's arguments that a warrant should have been pursued because of the number of officers involved in the case. Majority op. ¶50 n.15. It advances that "Officer Fenhouse could reasonably believe that asking another officer to obtain a warrant would be futile,

11

given the short timeframe before evidence of heroin use disappeared." Id.

¶88 However, the McNeely court explained that in "a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer . . . there would be no plausible justification for an exception to the warrant requirement." Id. at 1561. That is exactly the circumstance here, yet the majority's decision directly contravenes McNeely.

¶89 Under McNeely, there is no plausible justification for the majority's decision. It is undisputed that there were a total of five to seven officers working on Parisi's case. See majority op. ¶9. Officer Fenhouse and Officer Moua both followed Parisi's ambulance to the hospital. Majority op. ¶11. Any of the five to seven officers working on the case could have applied for a warrant while Officer Fenhouse followed Parisi to the hospital.

¶90 In addition, there was no reason for delay in obtaining a warrant given that the officers had probable cause as soon as they arrived at the scene. As referenced above, Parisi was given Narcan before he was transported to the hospital, which Officer Fenhouse knew was "usually administered for people who have overdosed on heroin." Majority op. ¶7. The officers at the scene also found "a bindle of what looked to be

12

heroin wrapped in tinfoil, some cut ends, and [a] marijuana pipe." Majority op. ¶10.

¶91 There is also no explanation for the delay in obtaining a warrant once Officer Fenhouse arrived at the hospital. Although Officer Fenhouse intended to have Parisi's blood drawn immediately, Parisi was initially deemed to be too unstable for the procedure. During the two hours that Officer Fenhouse waited at the hospital before Parisi's blood could be drawn, there was nothing that prevented him from obtaining a warrant.

¶92 After McNeely, this court has allowed only one exception to the warrant requirement for blood draws based on exigent circumstances. Tullberg, 359 Wis. 2d 421, ¶30. The majority contends that Tullberg is an analogous case involving warrantless blood draws. Majority op. ¶¶30, 40. It is not.

¶93 At the outset, the Tullberg court noted that the investigating officer "did not improperly delay in obtaining a warrant. He did not have probable cause to believe that Tullberg operated the motor vehicle while under the influence of an intoxicant until nearly three hours after the accident. If anything, Tullberg's actions, rather than the deputy's, necessitated the warrantless blood draw." 359 Wis. 2d 421, ¶44.

¶94 In contrast to the facts of this case, only one deputy was initially dispatched to the chaotic scene of the fatal collision in Tullberg. Id., ¶¶9-11. Additionally, Tullberg was not at the scene of the collision and the investigating deputy did not know he was the driver. Id., ¶¶8-10. When he was

13

finally interviewed at the hospital, Tullberg told the deputy that he was a passenger in the vehicle. Id., ¶12. It was not until nearly three hours after the collision when the investigation uncovered evidence that helped identify Tullberg as the driver responsible for the fatal collision. Id., ¶¶15-16.

¶95 Given the extraordinary facts and circumstances of that case, the Tullberg court explained that the deputy, when "confronted with such an accident scene and obstruction of his investigation, conducted himself reasonably." Id., ¶47. Under McNeely, and as it is applied in Tullberg, an exception to the warrant requirement for a blood draw is permissible only when circumstances prevent an officer from timely obtaining a warrant. McNeely, 133 S. Ct. at 1561; Tullberg, 359 Wis. 2d 421, ¶42. Here, however, the majority's analysis focuses only on facts and circumstances relating to dissipation because there were no facts and circumstances preventing at least one of the five to seven officers from timely obtaining a warrant.

¶96 In its effort to excuse the multiple officers' inexplicable failure to obtain a warrant, the majority conflates dissipation in the bloodstream with cases involving the imminent destruction of physical evidence. See majority op. ¶50 n.15. Relying on destruction of evidence cases, the majority asserts that "if officers suspect drugs are being flushed behind a closed door, [] the exigency is not eliminated merely because there are multiple officers at the scene." Id. (citing Kentucky v. King, 563 U.S. 452 (2001); United States v. Fiasche, 520 F.3d

14

694, 698 (7th Cir. 2008)). The majority then analogizes Officer Fenhouse's failure to obtain a warrant at the hospital to destruction of evidence cases where "split—second judgments-in circumstances that are tense, uncertain, and rapidly evolving." Id. (citing King, 563 U.S. at 466 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).

¶97 Such reliance on destruction of evidence cases is unpersuasive, because "[t]he context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a 'now or never' situation." McNeely, 133 S. Ct. at 1561 (citing Roaden v. Kentucky, 413 U.S. 496, 505 (1973)). Dissipation of a substance in the blood differs from circumstances "in which the suspect has control over easily disposable evidence." Id.

¶98 It is quite a stretch to compare the apparent availability of five to seven officers including a police officer sitting in a hospital waiting room for two hours, with a drug raid where officers hear evidence being flushed away. Likewise, the five to seven officers at the scene of the overdose knew that Parisi was not about to imminently destroy evidence. The police certainly did not have to break through the door on a moment's notice because Parisi's friends met the officers outside to help direct them to the proper location. Majority op. ¶5. When the police entered the apartment, Parisi was laying unresponsive on the living room floor in his own vomit. Majority op. ¶6. Unlike making a split-second decision to preserve evidence, the steady dissipation of heroin in the

15

blood is just not the kind of emergency that justifies foregoing a warrant.

¶99 I determine that under the facts and circumstances of this case, one of the five to seven officers could have secured a warrant in the two and one-half hours before Parisi's blood was drawn without significantly undermining the efficacy of the search. Officers were dispatched to the scene at 12:38 a.m. and arrived five to ten minutes after dispatch. Majority op. ¶4. Shortly thereafter, Narcan, the antidote for heroine, was administered. Majority op. ¶7. The blood draw did not occur until 3:10 a.m. Majority op. ¶13.

¶100 The State has the burden of proving the existence of exigent circumstances. State v. Richter, 2000 WI 58, ¶29, 235 Wis. 2d 524, 612 N.W.2d 29. It has utterly failed to do so here. Even if Officer Fenhouse's failure to seek a warrant is excusable——and it is not——there is a complete dearth of information as to why none of the available five to seven officers failed to seek a warrant.

¶101 Contrary to the majority, I conclude that there were no exigent circumstances justifying an exception to the warrant requirement. As a result, the warrantless blood draw violated Parisi's Fourth Amendment rights. Accordingly, I respectfully dissent.

¶102 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON, J. joins this dissent.

16