*212 REBECCA G. BRADLEY, J.
¶ 75. {concurring). For the third time this term, Justice Shirley Abrahamson has written a separate opinion discussing my participation or non-participation in cases pending in this court before I joined the court.[1] See New Richmond News v. City of New Richmond, 2015 WI 106, 365 Wis. 2d 610, 875 N.W.2d 107; and State v. Matalonis, 2016 WI 7, ¶ 79, 366 Wis. 2d 443, 875 N.W.2d 567. The dissent authors criticize my decision to participate in three cases: this case, Matalonis, and State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619;[2] but not other pending cases including New Richmond News. The dissent further suggests this court had an established procedure to follow when a new justice joins the court mid-term and that the three cases in which I chose to participate cannot be distinguished from other cases. The dissent is wrong on both points and I write separately to explain my reasons for participating in certain cases and not participating in others.
¶ 76. No Wisconsin statute, rule of appellate procedure, internal operating procedure ("IOP") or supreme court rule specifically addresses the participation of a newly-appointed justice in cases that were argued but not decided before the new justice was sworn in. The dissent has not cited any Wisconsin authority because none exists. This is the first time a newly-appointed justice joined the court mid-term *213 due to the death of a supreme court justice.[3] In four cases that were argued but not decided before I was sworn in, this court was deadlocked on whether to affirm or reverse the court of appeals: this case, New Richmond News, Matalonis, and Parisi. Significantly, in those cases where the court was deadlocked at the time I joined the court, no orders had been issued affirming the court of appeals. After substantial research, I learned there was precedent on how to proceed in New Richmond News, which was the only one of the deadlocked cases that had come to this court on bypass from the court of appeals. Under State v. Richard Knutson, Inc., 191 Wis. 2d 395, 396-97, 528 N.W.2d 430 (1995), when a case is before this court on a petition to bypass or a certification, and a tie vote results, the case is remanded to the court of appeals for decision. That precedent was followed when this court vacated the bypass petition in New Richmond News, under Richard Knutson, Inc., and remanded the case to the court of appeals. This procedure recognizes that this court could benefit from a decision rendered by the court of appeals and then revisit the issues if one of the parties petitions for supreme court review.
*214 ¶ 77. There is not, however, any Wisconsin authority with respect to new justices handling pending "deadlocked" cases that have come to this court on petitions granted for review. If I declined to participate in the three "deadlocked" cases, the court of appeals' decisions would stand. This court, however, decided many months ago (April 2015 for this case and Matalonis, and June 2015 for Parisi) that the court of appeals' decisions in these three cases merited this court's review. Hundreds of petitions for review are filed with this court every year and this court accepts only a limited number of cases. When this court accepts a case for review, not only do the parties undertake significant time and expense to litigate the matter before the supreme court, but the people of the State deserve the issues presented to be decided by the supreme court. Although our court of appeals judges do an excellent job, they serve a different role than the supreme court. The court of appeals' primary function is error-correcting. See Cook v. Cook, 208 Wis. 2d 166, 188, 560 N.W.2d 246 (1997). The supreme court, on the other hand, serves the primary function of "law defining and law development." Id. As a member of this court, it is my duty to participate in those cases so that the people of Wisconsin receive a decision from the supreme court. In each of the deadlocked cases, nothing had been decided and no orders or opinions had been issued at the time I joined the court. It is also important to note that the initial vote on these three cases after the passing of Justice Crooks was 3-3. Although this case and Parisi ultimately were released as 5-2 decisions, this could not have impacted my analysis regarding these cases in which I would participate because at the time I chose to participate, these cases were deadlocked 3-3. The dissent misleads *215 the public in paragraph 145 by omitting this important fact when it references the 5-2 final result in this case and Parisi. In doing so, the dissent implies this case and Parisi were treated differently. That is not true. My participation analysis was consistent with respect to each of these cases.
¶ 78. In each deadlocked case, I watched oral arguments on WisconsinEye[4] and would have requested re-argument if important questions had been left unanswered. We are fortunate to have every oral argument video-recorded and available for viewing on WisconsinEye. These recordings are of high quality, allowing viewers to see the argument as if they were present. WisconsinEye has multiple video-cameras, which rotate between the lawyers arguing at the podium and the justices asking questions. All demeanors, hand gestures, and other non-verbal forms of communication are contained in the video-recordings. These video-recordings have allowed past justices, who could not attend oral argument in person, to do the same thing I did — watch the oral argument on WisconsinEye.
¶ 79. Following my review of each deadlocked case, I participated in conferences with my fellow justices for further discussion of and to reach a majority decision in each case, pursuant to IOP II.E, governing post-argument decision conference. This reasonable procedure provided the best option allowing this court to timely decide cases upon which it agreed the supreme court needed to give guidance. The people of Wisconsin deserve timely decisions from this court. If the oral arguments had not been video-recorded and available for viewing, we would have been forced to *216 subject these parties to the additional cost and inconvenience of re-arguing, for the sake of one new justice, the exact same arguments that had already been presented a short time earlier to the other six justices. Justice Abrahamson's proposed procedure requiring reargument would have delayed justice, added unnecessary expense, and may have even delayed these cases into the 2016-17 term.
¶ 80. Similar to Wisconsin, there is no federal rule specifically addressing what should occur when a new justice joins the court after the term has commenced, with respect to pending cases on which the court has reached an impasse and no decision has been issued. While there is a federal rule addressing petitions for rehearing, such petitions are similar to Wisconsin's reconsideration motions and, like the Wisconsin rule, the federal rule applies only to judgments or decisions of the court. This is made clear in Stephen M. Shapiro, et al., Supreme Court Practice, 838 (10th ed. 2013), which states that "rehearing petitions have been granted in the past where the prior decision was by an equally divided Court." (Emphasis added.) At the risk of being unduly repetitive but in order to underscore the significance of this fact, no judgments or decisions had been issued in the deadlocked cases at the time I joined the court.
¶ 81. My participation in the deadlocked cases is supported by the past practices of the United States Supreme Court under similar circumstances. Following the death of Chief Justice William H. Rehnquist and the appointment of Justice Samuel Anthony Alito, Jr., that Court revisited three cases in which the Court was presumed to be deadlocked; Justice Alito joined the 5-4 majority in each case following re-argument. See Shapiro, supra, at 838.
*217 ¶ 82. Even though Justice Abrahamson explained her concerns in her concurrence in New Richmond News, she elected to write separately a second time in Matalonis, criticizing my decision to participate in Matalonis. Although I could have responded to her dissent in Matalonis, I chose not to because the dissent was unrelated to the merits of the case. I believed Matalonis would be Justice Abrahamson's last separate writing criticizing my participation and I chose not to write separately to avoid further delaying the release of the Matalonis opinion.
| 83. In the dissent here, Justice Abrahamson goes beyond her writings in New Richmond News and Matalonis by including a reference to the allegations of Matalonis's lawyer — allegations made in a motion for reconsideration based on Justice Abrahamson's criticism of my participation. By memorializing in her dissent here the adversarial allegations made by an attorney not even involved in the case at hand, Justice Abrahamson has revealed her true motivation behind her critical concurrence and dissents. Justice Abrahamson's separate writings were not about documenting for future courts how to properly handle pending cases when a justice dies mid-term and a new justice joins the court. Including the non-prevailing lawyer's adversarial allegation from Matalonis — an entirely separate case — in the dissent in this TPR case is entirely inappropriate and serves only one purpose: to give others material — within a published Wisconsin Supreme Court decision, no less — to attack and criticize me. The Code of Judicial Conduct requires that: "A judge shall dispose of all judicial matters promptly, efficiently and fairly." SCR 60.04(l)(h). Part II of the dissent here violates this *218 rule and is cumulative and unnecessary as similar writings already exist in both New Richmond News and Matalonis.
¶ 84. Justice Abrahamson and Justice Ann Walsh Bradley suggest in this dissent that I am sharing "for the very first time" my explanation on my participation. See dissent, ¶ 135. Although this is the first time I have shared my reasoning for participation in a written opinion, Justices Abrahamson and Ann Walsh Bradley have known my reasons since October 2015 when I provided them (and the entire court) with my reasons for participating based on the substantial research I conducted. I did not feel it necessary or appropriate to delay release of these opinions to include a discussion of my participation decision. Justice Abrahamson now joined by Justice Ann Walsh Bradley did not agree with the reasonable, well-researched, and supported decision I made. Instead of accepting it, Justice Abrahamson chose to repeatedly criticize me: first in New Richmond News by arguing I should have participated and then in Matalonis because I did participate. In New Richmond News, she complained that remanding to the court of appeals delays a decision, yet in Matalonis and St. Croix, (joined by Justice Ann Walsh Bradley in St. Croix), advocates for a procedure that delays both decisions. Justice Abrahamson also engaged in multiple revisions of the dissent here causing substantial delay in the release of this opinion. Her decision to write separately in these cases has delayed justice, and with respect to this case in particular, where efficient resolution is paramount because this case involves a child's well-being, this is particularly troubling. Part II of the dissent contributes nothing to any legitimate function of the court and serves only to perpetuate the diminished reputation of Wisconsin's *219 highest court, which my other colleagues and I are striving to restore. The time Justice Abrahamson spent on these separate writings would have been better served drafting a proposed rule to establish a procedure specifically addressing these circumstances. Perhaps this court should enact a rule outlining the proper procedure for processing deadlocked cases when a new justice joins the court after the term has commenced so new justices are not forced to defend themselves against decisions made in good faith. At present, no such rule or procedure exists, and as I have explained, neither Justice Abrahamson's experience in 1976 nor the United States Supreme Court practices mirrors the circumstances presented here.

 For the first time, Justice Ann Walsh Bradley joins the dissent.

 See State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619. In Parisi, Justice Abrahamson did not write her own dissent and instead joined the dissent of Justice Ann Walsh Bradley, who wrote about the merits of that case rather than my participation.

 There is one other time in history of which we are aware where a supreme court justice died before the court's term concluded. Chief Justice Horace W. Wilkie died on May 23, 1976. After his death, orders were issued on June 30, 1976 affirming the county courts in cases where the supreme court was equally divided. See Punches v. Schmidt, 73 Wis. 2d 206, 243 N.W.2d 518 (1976); State v. Kline, 73 Wis. 2d 337, 243 N.W.2d 519 (1976). Justice Abrahamson was appointed to fill the vacancy created by Chief Justice Wilkie's death, but she was not sworn in until September 1976 when this court's new term began.

 WisconsinEye, http://www.wiseye.org (last visited Feb. 23, 2016).